Nelson, C. J.
Two principal objections have been taken to the right of the plaintiffs to recover: I. That the promise is nudum, pactum, there being po consideration to support it; II. That if valid, the conditions upon which it was made, have not been fulfilled.
1. Every promise for the breach of which an action of assumpsit may be sustained, must he founded upon a consideration of benefit to the defendant, or to a stranger, or of damage or loss to the plaintiff at the request of the defendant; but any act of the plaintiff from which the defendant derives a benefit, or any labor, detriment, or inconvenience, sustained by the plaintiff, *409 however small the benefit or inconvenience, is a sufficient consideration, if such act is performed, or inconvenience suffered, at the instance and request of the defendant. (1 Selw. N. P. 32, and cases cited.) It is not claimed in this case that the defendant has derived any benefit from the contract upon which the action is founded; and the inquiry will be, whether the plaintiffs have sustained any damage or detriment at the instance and request of the defendant, or directly flowing from the promise. The substance of the contract between the parties, leaving out the particulars, is this: The defendant agrees to pay the plaintiffs, for the benefit of the institution they represent, $800, in four annual payments, provided they will procure subscript tions and contributions which, with his, shall amount to $50,000 before a given time; and shall afterwards invest the same as specified. Or, putting it in another form :—The defendant agrees, if the plaintiffs will procure subscriptions for the benefit of their institution to the amount of $50,000, including his, and will invest-the same as therein directed, that he will pay them $800 in four annual payments. The plaintiffs consent, and perform the conditions. It seems to me that the labor and expense of procuring the subscriptions and investing the fund, constitute damage and loss to the plaintiffs, which bring the case within the very definition of a good consideration for the promise. In the case of Sir Anthony Sturlyn v. Albany, (Cro. Eliz. 67,) the declaration set forth that the plaintiff had made a lease of land to J. S. for life rendering rent—who granted all his estate to the defendant, the rent being behind for several years. The defendant agreed, if the plaintiff coul d show to him a deed that the rent was due, he would pay it. The plaintiff then averred, that on such a day, &c., he showed to him the indenture of lease by which the rent was due, &c. The plaintiff recovered; and a motion was made in arrest, for that there was no consideration Upon which to ground the action. But it was adjudged for the plaintiff, the court observing, that when a thing is to be done by the plaintiff, be it ever so small, it is a sufficient consideration for the promise.
So in the case of Knight v. Rushwood, in the same book, *410 (p. 469,) Mrs. R had given a bond for £200 to the plaintiff, and afterwards assigned to the defendant all her goods to pay her debts. The defendant insisting that it had been read to the obligor as a bond of £100 only, promised the plaintiff to pay it, if he and two witnesses would swear before the mayor of London, that it was read to her as an obligation of £200, which was done. The question was, whether there was a consideration for the promise; and the whole court held, that the inconvenience of making the oaths was a sufficient consideration ; that the smallness was immaterial—if any, it was enough—and referred to the previous case of Sturlyn v. Albany. (See also March v. Culpepper, Cro. Car. 70.) So if A. promises B. to pay him a sum of money if he will call for it at a particular time, and B. calls accordingly, the promise is binding; the calling for the money being a sufficient consideration for the promise. (Powell on Cont. 343; 6 Pick. 384.) These cases are all referred to as sound law in the modern respectable treatises on the subject. (Comyn on Cont. 16 ; 1 Selw. N. P. 32; Powell on Cont. 343; Saund. Pl. and Ev. 147; Bac. Ab. Assumpsit, C.) And the principle is recognized in Brooks v. Ball, (18 John. 337.) It is laid down in Comyn’s Dig. (Action upon, the case upon Assumpsil, B. 4,) that proof of a debt is a good consideration for an assumpsit, “ for it is a charge to the plaintiff : as if a woman, in consideration of the proof of a debt due from her husband, promise payment. So if an heir promise to pay the debt of his ancestor; or if an executor promise upon proof of the delivery of goods to his testator to pay for them.”
The case of McAuley v. Billenger, (20 John. R. 89,) is not distinguishable from the present. That was an action to recover a sum subscribed by the defendant below, for the repairs of a church. The suit was in the name of a committee appointed to receive subscriptions for this purpose, and to whom the money was made payable, and who had subsequently entered into a contract with a person for the repairs as contem plated in the subscription paper. Entering into this engagement for the repairs, agreeably to the understanding of all parties concerned in getting up the subscription, and in pursu *411 anee thereof, was regarded as a sufficient consideration for the promise to pay by the subscribers. The case of Amherst Academy v. Cowls, (6 Pick. 431,) contains similar doctrine. A subscription to a fund of $50,000 to be made a permanent investment for the benefit of a literary institution, was held to be valid and binding, as the execution of the trust on the part of the trustees, or even being engaged in the process of execution, afforded a sufficient consideration for the undertaking of the defendant. And the case of The First Religious Society of Whitestown v. Stone, (7 John. R. 112,) stands upon the same principle.
A. Stewart, plaintiff
in error, in person. 1. The mutual promises laid in the several counts are not proved. It does not appear that the trustees promised, in any way, to procure subscriptions, &c. Such proof was essential to sustain the counts. *412 (The Utica & S. R. R. Co. v. Brinckerhoff, 21 Wend. 139.) No such promise is contained in the writing subscribed by the defendant, and the rules of evidence do not permit a parol addition to be engrafted upon a written agreement. (Cowen & Hill’s Notes, 1467.) The board of trustees are not proved to have recognized the subscription, or to have had any knowledge of it prior to the 19th day of June, 1834, nearly a year after the subscriptions commenced. They could not, therefore, have made the promise attributed to them, and which is said to form the consideration of the defendant’s promise. And there is no evidence of any such promise being made by any agent of the board.
*411 I cannot doubt, therefore, but that the assent of the plaintiffs to the proposition contained in this instrument, and the fulfilment of its terms and conditions on their part, or in other words, the labor and expense of procuring subscriptions to the fund, and of investing the same at their instance and request, as may be fairly inferred from all the circumstances attending the proposition, afford a sufficient consideration for the undertaking of the subscribers.
2. The paper under date of June 19th, 1834, signed by fourteen gentlemen, abundantly able to fulfil the obligation then entered into, provided fully for any deficit that might happen to exist in the procurement of subscriptions to the amount of $50,000. This obligation was entered into for the express purpose of meeting any possible contingency in this respect. It is as explicit as language can make it, and covers every deficiency pointed out in the course of the trial.
I will only, add, that all the counts in the declaration are defective, in not setting out a consideration for the promise declared on ; they would be bad, doubtless, even in arrest of judgment. The plaintiffs should amend; and construct me counts in conformity with the views of the contract as above expressed.
*412 2. This was a contract wrhich was not to be performed in one year, and consequently it required an agreement in writing “ expressing the consideration.” (2 R. S. 135, § 2.) But if there is any evidence of the promises which are alleged to constitute the consideration of the defendants undertaking, it is not contained in the writing, but rests in parol. The agreement is therefore void.
3. The defendant’s subscription was nudum factum, and will not support an action. (Limerick Academy v. Davis, 11 Mass. R. 113; Farmington Academy v. Allen, 14 id. 172; Bridgewater Academy v. Gilbert, 2 Pick. 579; Amherst Academy v. Cowls, 6 id. 427; Pearson v. Pearson, 7 John. 26; The Utica and Sch. R. R. Co. v. Brinckerhoff, 21 Wend. 139; Rann v. Hughes, 7 T. R. 350, note (a); 2 Conn. R. 194.)
4. The condition requiring $50,000 to be subscribed within a limited time was not performed. The several subscriptions payable in property and those made by married women and unincorporated societies were void, and of course cannot be taken into the account to make up the amount. (Middlebury College v. Loomis’ adm'rs, 1 Verm. R. 189; The same v. Williamson, id. 212.) Deducting these, the amount is reduced far below the prescribed limit. The contract of the fourteen persons does not supply the deficiency. The engagement contained in that paper was, that $50,000 should be subscribed, not that the subscriptions should be valid or available. That amount óf *413 subscriptions was in fact obtained, and the agreement therefore became inapplicable ahd Useless. This engagement of the fourteen gentlemen was also void, because they were indemnified by the board of trustees,- by the resolution simultaneously passed If the subscribers had become liable, they could have called upon the corporation for indemnity, by the terms of the resolution. It was fraudulent in the plaintiffs to cause the agreement to be laid before the referee, without at the same time furnishing him with a copy of the resolution, to the end that he might see the real character of the engagement. Furthermore, the agreement of the fourteen persons was discharged by the release of one of them to make him a witness in the cause. There was no consideration in fact for that agreement, and it was void for that reason,
5. The release of Mr. Dwight, the presidént of the college, from his subscription, was a discharge of all the subscribers. •
6. The judge erred in refusing to submit the case to the jury.
C. P. Kirkland <f- J A. Spencer, for the defendants
in error.
1. The undertaking of the defendant contained in the subscription paper was founded upon a sufficient consideration. (1 Wheat. Selw. 32, and cases cited; Sturlin v. Albany, Cro. Eliz. 67; Knight v. Rushwood, id. 469; Pow. on Cont. 343; Com. on Cont. 16; Train v. Gold, 5 Pick. 384; Saund. Pl. & Ev. 147; Bac. Abr. Assumpsit, C.; Brooks v. Ball, 18 John. 337; McAuley v. Bellinger, 20 id. 89; First Society Whitestown v. Stone, 7 id. 112; Com. Dig. Action on the Case upon Assump., B. 4; Amherst Academy v. Cowls, 6 Pick. 427.)
2. The declaration is fully sustained by tire evidence.
3. The conditions of the subscription were complied with by the plaintiffs below. The question as to the validity and responsibility of the subscriptions was submitted to Mr. Hunt; and his certificate that responsible subscriptions and contributions to the amount of §50,000® had been made, is conclusive between the parties. The question therefore which has been made as to the validity of certain of the subscriptions does not now arise. If this were otherwise, the Undertaking of the 19th *414 June, 1834, would supply any deficiency. Whether the deficiency arise from the want of a sufficient amount of nominal subscriptions, or from the invalidity of any which were made in form, it is covered by the undertaking referred to. That. agreement is founded upon sufficient consideration ; but if it were not so, as to all the persons who signed, those who were present when it was exhibited to Mr. Hunt would be estopped from questioning its validity; and it is proved that they were of sufficient responsibility. The release of the secretary prior to his being examined as a witness, did not affect the liability of the defendant.
4. The resolution remitting President Dwight’s subscription did not operate to discharge any other of the subscribers. It was an act in the administration of the trust which, whether right or wrong, cannot be questioned in this way. The effect contended for follows only .from a technical release; but this was only a resolution which could have no legal effect until followed by an actual acquittance under the seal of the corporation. But if it were in fact a release, it would not discharge the other subscribers; for such was evidently not its intention. (Dakin v. Williams, 17 Wend. 457; S. C., in error, 22 id. 210.)
5. There was no question of fact to be submitted to the jury.
The Chancellor. The first question in this case, but which I consider of minor importance, is that of consideration. The agreement upon which the suit was brought was not by the terms of it, nor was any part of it, to be performed within one year from the making thereof. The subscription is dated upon the 6th of July, 1833, and all the counts, except the third, which was not attempted to be proved, allege the agreement to have been made by Stewart on that day. The first instalment of the subscription was not to be paid until the first of August, 1834. The case, therefore, comes within the first subdivision of the second section of the title of the revised statutes relative to fraudulent conveyances and contracts in relation to goods, chattels and things in action; and the agreement must not only be in writing, but there must be a valid and sufficient considera *415 tion, appearing upon the face of the writing, upon which the subscribers are sought to be charged. (2 R. S. 135.) The language of the statute is explicit in declaring, that every agreement that by its terms is not to be performed" within one year from the making thereof shall be void, unless such agreement, or some note or memorandum thereof expressing the consideration, is in writing and subscribed by the party to be charged therewith. The consideration stated in the three counts of the declaration which were attempted to be sustained by proof, is in part, at least, an alleged agreement on the part of the corporation to procure subscriptions and contributions to the amount of $50,000 by the first of July, 1834. But upon the face of the written agreement, I find no evidence of any undertaking on the part of the corporation that they will procure subscriptions and contributions to the amount of $50,000, or to any amount, within the prescribed period. Nor was their acceptance of the subscription of Stewart even an implied assent on the part of the corporation that they would even attempt to raise the amount By circulating a subscription for the purpose. And if the subscription papers had never been presented to any one after Stewart’s name was subscribed to it, he could not have complained that the corporation had violated any agreement, either express or implied, on their part.
It is true that it was made a condition of the agreement that It should not be binding upon the subscribers, unless the aggregate of their subscriptions and contributions should amount to at least $50,000 within the time specified. But even in this (condition there is no intimation that the corporation are to procure, or to have any instrumentality in procuring, such subscriptions and contributions, or that they were to be even permitted to expend the then existing funds of the college for that purpose. And even if we go out of the writing, and examine the parol proof which was adduced to make out such a consideration, I do not find any evidence which shows that there was an agreement on the part of the trustees to be at the expense of procuring subscriptions. Indeed, upon reading the written agreement, I should infer the contrary to be the fact; *416 and that the donors, or some of them, whose names headed the' subscription and who were the friends of the institution, had gotten up this subscription as an agreement between themselves" to contribute certain proportions to increase the funds of the col-lege at least $50,000 beyond the amount it before had; and that it would be inconsistent with the real object of the donors to have those funds reduced by expenditures of the kind contemplated.
As a subscription of a single individual, agreeing to make á donation to another individual or to a corporation for the benefit of the donee merely, I should have great difficulty in finding a valid consideration to sustain a promise to give without any equivalent therefor, and without any binding agreement on the part of the donee to do any thing on his part which: would be a loss or injury to him. And it can hardly be said to be a consideration to support a promise of a donor to give at a future time, that the donee agrees to receive and invest the fund when paid and to apply it to the payment of his-debts generally, or any particular class of his debts; or to apply it to the payment of such sums as he may thereafter agree to give to his servants for their services. In the case of The First Religious Society in Whitestown v. Stone, (7 John. Rep. 112,) no such difficulty existed,, for there was a sufficient consideration stated in the contract itself. The agreement in that case was stated to be in consideration of one dollar received from the trustees of the corporation, as well as the further consideration that it was to raise a salary for a clergyman to be employed to preach for" the benefit of the subscribers.
Neither is there any difficulty in my mind in finding a good and sufficient consideration to support a subscription of this kind made by several individuals. Every member of society has ah' interest in supporting the institutions of religion and of learning in the community where he resides. And when he consents to become a subscriber with others to raise a fund for that purpose, the real consideration for his promise is the promise which others have already made or which he expects them to make, to con-*' tribute to the same object. In other words, the mutual promises
*417 of the several subscribers to contribute towards the fund to be raised for the specified object in which all feel an interest, is the real consideration of the promise of each. For this purpose also, the various subscriptions to the same paper and for the same object, although in fact made at different times, may in legal contemplation be considered as having been made simultaneously. The consideration of the promise, therefore, is not any consideration of benefit received by each subscriber from the religious or literary corporation to which the amount of his subscription is made payable, nor is his promise founded upon any consideration of injury which the payee has sustained or is to sustain or be put to for his benefit. But the consideration of the promise of each subscriber is the corresponding promise which is made by other subscribers. Mutual promises have always been held sufficient as between the parties to sustain the promise to each. And it has also been the settled law from the time of the decision in the case of Dutton v. Pool, (Freem. Law Rep. 471,) in 1678, down to the present time, that a party for whose benefit a promise is made may sue in assumpsit upon such promise, although the consideration therefor was a consideration between the promisor and a third person. (See Schermerhorn v. Vanderheyden, 1 John. R. 139.) (a) Upon this subscription the several subscribers mutually promise each other to pay to the trustees of Hamilton College the sums subscribed by them respectively, upon the condition that the funds when collected by the corporation shall be invested as a permanent fund, and the income thereof applied to the support of the officers of the institution. The legal effect of the written agreement, therefore, is the same as if it had been stated at length in the subscription that the consideration of the promise of each was the promise made to him by other subscribers to pay to the corporation the sums by them subscribed respectively. And if this agreement had been set out in the declaration with the names of other subscribers thereto, with the sums subscribed by them re *418 spectively, I think a sufficient consideration to support the prom- ' ise to pay to the corporation of the college would have appeared -to support the’action.
There’was "however a very importánt condition in this mutual agreement between the- subscribers to this fund, which I think has not been complied with according -to-its spirit'and "intent; that is,-that- none of their subscriptions- should be binding upon those who had- "thus mutually agreed -to contribute to the '-fund" as donors, unless the aggregate of their' Subscriptions and contributions to the fund should amount "to $50,000 within -a specified time. It is evident from thetéstimony that many of the subscriptions were from -those'-who- were not competent to contract, and of course such must he laid out of the question -uhless their subscriptions were-actually paid within the time prescribed for subscribing the $50,000, and before the- referee-was called upon to certify-that responsible subscriptions and contributions to the specified "amount had been máde-up. And if the "subscription of the 10th bf June, 1834, had not been laid before the referee who was to-decide upon that question,"these is no reason to believe he would have given the''requisite'Certificate. That subscription, however; was apparently-a'subscription made by "individuals -as Actual donors,-' and Upon the- same terms of equality and mutuality'as the súbscri'ptions of other persons were made. And if it had been so in fact as well as-in appearance, the conditions upon which the' donors had -agreed -to become liable and to pay -would have been complied' with. It now turns out,-however, that the individuals who "made this sweeping subscription' to make up the sum to $'50,000 within the time specified, were-not-real -donors within the'intent -and meaning bf the agre'ei’nent, inasmuch as they, at the time-of that subscription- and simtil-ta'nebuály- therewith, rfeceiked from the b'tiard of trustees of-the "college an agreement or promise, entered upon the minutes in the- shape of a" formal'resolution to "the following effect: “ Resolved That this board 'pledges' itself to continue to raise subscriptions and contributions after the first of July, to save harmless those persons who may pledge themselves to make good any deficiency which may be found to exist on the last day of June instant.” The legal effect, therefore,--of this *419 general subscription of the 19th of June, 1834, in connection with this resolution, was that of a mere loan or advance of the amount requisite to make up the sum of $50,000, upon an agreement, on the part of the college, that the money should be refunded to them out of subscriptions and donations which should thereafter be made, and the corporation pledged itself to continue to solicit such subscriptions after the first of July.
'It is evident from the names appended to this general subscription, that they could not have intended to commit a deliberate fraud upon themselves and "the other- persons-who .had previously subscribed so liberally to the funds of this institution. They undoubtedly supposed that this subscription.,would be a compliance with the condition of the agreement that the amount of subscriptions and contributions should amount to, $50,000 by the first of July. But they were unquestionably under a mistake in that respect. The essence -of every, agreement of this kind is, t-hat there should be perfect equality among the subscribers as to the nature and extent of their respective liabilities for the several sums subscribed by them respectively. :To have made this general subscription valid so as to. fill up the ;sum of subscriptions and contributions to the amount of the $50,000 withinthe terms of the agreement, it:should have-been an. absolute donation of the amount- of the deficiency, to he paid at the same time as the other subscriptions, and-no part of it to.be restored or refunded to them upon any contingency or in any event other than such as. was common to the subscriptions of all the other subscribers. Even-in an ordinary-composition deed, where there is an express agreement between the creditors themselves to discharge the debtor-upon receiving, a rateable proportion df . their respective debts,, any private., agreement or understanding between the debtor-and any particular creator that the latter- shall at any time, or - in. any contingency, receive a greater sum than the .amount df his debt. as .specified in the composition deed,, is held to be void as a fraud upon the other creditors. (1 Anst. Rep. 202 ; 3 id. 910.)
It will be seen by,a reference, to the.agreement of the subscribers to this fund, that it is- not limited to the. $50,000, nor to what shall be subscribed thereto previous,-to the 1st o£ July, *420 1834. But that amount at .least must he subscribed by that time, to render the subscriptions made either before or after that time binding upon any of the subscribers. Whatever was subscribed to the fund even after the 1st of July, those who subscribed previous to that time had a right to insist should be invested for the purposes specified in the agreement; even if the whole amount of subscriptions and contributions for that object should amount to $100,000. . The trustees therefore had the same right to pledge the fund subscribed before the first of July as that which might be subscribed after that time, to indemnify those who should have agreed to subscribe to make up the deficiency in the $50,000. Again ; every institution of this kind depends for its future support not merely upon the donations its patrons may make at any particular time, but upon the continued support which it is expected to receive from future donations during the time of its existence. And it would be contrary to the whole spirit of this agreement that any such anticipated donations should be pledged' to refund to a part of the subscribers for the $50,000, any portion of their contributions or subscriptions which had been made under the agreement. The general subscription of the 19th of June, 1834, was therefore entirely invalid as a compliance with the terms upon which the subscriptions were to become payable, and the plaintiff in error never became liable upon his subscription.
The exceptions to the decision and charge of the judge who tried the cause were therefore well taken, and the judgment of the court below should be reversed.
Senator Bogkee delivered a written opinion, in which he came to the conclusion that the judgment of the supreme court ought to be reversed for the error of the judge in declining to submit the questions of fact to the'jury. Upon another point in the cause this opinion proceeds as follows :
But there is another question of very great interest and imortance, whether there was any consideration for the defendant’s promise, so as to make it a legal obligation. It may be assumed'as an axiom, which cannot be disputed, that a promisfounded on duties of- imperfect obligation, or mere motives of *421 oenevolence, or a desire to promote the interests of education, of charity or piety, is nothing more than the promise of a gift, and is not a legal contract on which an action can be maintained. If we take the first clause of this subscription paper by itself, where the subscribers bind themselves to pay certain sums of money to the trustees of Hamilton College, it does most clearly and inevitably come within the description of a gratuitous promise, and is void for want of consideration. Do the conditions which are underwritten vary the obligations which the subscribers are under to the trustees of the college? The first of these conditions is merely directory, and relates to the investment and appropriation of the moneys when collected, and can have no bearing upon this question of consideration. The second condition is not, as is incorrectly stated in the second count of the plaintiffs’ declaration, “ provided the plaintiffs should and would, by the 1st day of Jul y, 1834, procure subscriptions and contributions to the amount of $50,000.” If the agreement had been that the defendant would pay $800 to the plaintiffs, provided they should and would raise $50,000, it would be a good ex-ecutory consideration, and would, in my view, entirely change the nature of this instrument, and transform what I now consider a naked promise of a donation into a legal and binding contract. The meaning of this condition must be ascertained from the terms in which it is expressed. There is no reference to the plaintiffs, and it does not appear from the instrument that they are to perform any conditions. The promise is to pay money upon a contingency having no relation to any action on the part of the plaintiffs. If the unqualified promise is void for want of consideration, I cannot conceive that it is rendered more obligatory by the condition contained in this subscription paper. The promise of the defendant, and also the promises of all the other benevolent and public spirited gentlemen who have joined with him in the subscription, are voluntary and gratuitous donations ; and they are not less so because they are conditional and depend upon the contingency that the subscriptions shall within a limited period be raised to $50,000. This condition was doubtless made as an inducement to liberal subscriptions, *422 and as' an incentive to the- friends of the college to exert them-’ selves in raising' thefund; It is ah- arrangement-among the parties who are subscribers, and the obvious motive of each one is to make-his own subscription the means of calling into exer-' rise the liberality-of others.- In looking for a consideration to-support a-contract between these parties, we cannot go beyond the subscription-paper. That is the only evidence on which any legal claim cah be-asserted. We do not find in this-paper-any act or-thing-to bé done by the-plaintiffs, on the performance of which they, can be legally entitled to claim as a-debt what was offered as a gift.-
I have not been able to discover any judicial decision; or any principle laid-down by- any approved elementary writer, on the authority of which this action can-be supported. In Limerick Academy v. Davis (11 Mass. R. 113,) the action was brought by the trustees od a subscription to pay money- to erect an academy- in Limerick. Ch. J. Sewall, in granting the motion for a notisuit, -remarked as follows-: “ The general principle is, that-Voluntary agreements and promises, however reasonable the expectation-from them of gifts or disbursements even to public uses;-when made without consideration, are not- to be enforced as contracts: but where the promise-is made in conse^ quedce of any thing yielded to the disadvantage of the promisee, and so where it' is a proposal upon a: consideration after-wards performed or gained to the promisor, this-may import a sufficient consideration.” We are referred- by the plaintiffs’ counsel to the case of Amherst Academy v. Cowls, (6 Pick. 431.) The action was on a promissory ndte expressed to be for value received, and given on the consideration of a subscription before made to the funds of the academy. It was held that the note was founded on good consideration. There was a subsequent acknowledgment of indebtedness, and a consideration 11 for-value received ” expressed on the face- of the note. It is very far from being an authority to shew that the plaintiffs in this cause can' recover on a naked voluntary subscription. I think this is a clear case in-favor of the plaintiff in error, and that the judgment should be reversed upon the ground that the promise *423 declared on is, without consideration, and that no action upon it can be sustained.
Senator Barlow delivered a written opinion in favor of reversing the judgment of the supreme court, on the grounds, 1. That the subscription was a voluntary undertaking made without consideration and therefore void; 2, That the condition requiring $50,000 tobe subscribed within a limited time had not been performed; and 3. That the board of trustees had discharged all the subscribers, by remitting the subscription of President Dwight.
Senator Beers delivered a written opinion in favor of reversing the judgment.of the supreme court, on the ground that the circuit judge erred in not submitting the questions of fact to the jury.
Porter, Senator. The defendant below was. sued upon-his, subscription to the funds of Hamilton College, and he resists the payment upon, a variety of grounds. It appears that a special effort was made, in the year 1833, to raise the sum of $50,000, to be added to the permanent funds of that institution; but the income of this sum was to be applied specially to the payment of the salaries of the officers of the college. The first, objection that I propose to consider, is that which affirms that-there was no consideration for the promise made by the defendant to pay the trustees the amount of his subscription.
By the instrument signed by the defendant, the subscribers promised to pay to the trustees, of Hamilton College the sums of money set opposite their respective names, upon.certain conditions therein specified. The question is, whether there appears upon-the face of the instrument a consideration to sustain the promise made by the defendant. Let us consider the whole scope and extent of this writing, and the understanding and agreement of both parties at the time it was signed. The trustees come to the defendant and propose to him, that if he and others will promise to pay them $50,000, as a permanent fund, the interest, of which shall be applied to the payment of teachers in. the col *424 lege, they will incur the labor and expense of obtaining the subscription to that amount, to be certified, by Mr. Hunt or Mr. Johnson; that they will collect the same, and invest the amount collected permanently, and in some safe and secure manner; that they will collect, receive and pay over the annual interest forever thereafter to the teachers of the college, free from all charge upon this fund ; and they engage to take upon themselves the care and expense of taking charge of the fund, and preserving it in all its integrity, upon a continued permanent investment, and of applying the income according to the designs of its public spirited, enlightened and liberal donors, free from all abatement ; so that their charity may go down to all time, testifying to their liberality, and enabling this public institution to confer upon the community that is interested in its prosperity, the blessings of education and science. All this, they say, we will undertake on our part. The defendant says, very well • if you will promise for yourselves and your successors to perform this very charitable service if the subscribers will promise to pay you this amount, I am content, and will promise, as one of those subscribers, to pay you $800 towards that fund, which promise is to be binding upon me, if responsible subscriptions are obtained to that amount in the opinion of Mr. Hunt or Mr. Johnson. It seems to me that this is a fair and rational paraphrase of the real agreement between these parties. And if so, is there not a mutuality in it; a promise on the part of the defendant to pay, provided the trustees will promise on their part to perform 1 I think the promise on the part of the trustees is valid, and obliges them to perform their agreement; and that therefore it furnishes a good consideration for the promise of the defendant. There is a contract made between the donors and the trustees, for the donation, security and disposition of the fund. The promise on the part of the trustees they have assumed and ratified by accepting the subscriptions and collecting the fund, and they have subjected themselves to a perpetual obligation to fulfil that promise in good faith. This obligation may be enforced at all times; and the manner of executing the trust on their part may always be the subject of judicial inquiry, and *425 the courts will require that the trusts and the promises are all fulfilled.
In the case of the Trustees of Dartmouth College v. Woodward, (4 Wheat. 518,) Ch. J. Marshall, speaking of the contributions to the funds of that institution, says : “ These gifts were made, not indeed to make a profit to the donors, or their posterity, but for something in their opinion of inestimable value, for something which they deemed a full equivalent for the money with which it was purchased. The consideration for which they stipulated is the perpetual application of the fund to its object, in the mode prescribed by themselves.”
It is not important that the consideration of a promise should be plainly expressed in the writing: it is enough if it appears from the nature of the instrument and the recitals contained in it. If it is manifest that there was in the minds of the parties some obligation assumed or some service to be rendered by the promisee as the equivalent asked for the promise by the promisor, the promise is not void for want of a consideration. The law upon this subject is well stated, and the authorities collected in Saund. Pl. & Ev. 147. I cannot doubt but that the promise of the defendant was made upon a good consideration.
The next question is, whether the conditions upon which the promise was made have been complied with. There is in truth but one condition to be performed before the payment of the money upon the subscription became obligatory; and that is, that the aggregate of the subscriptions and contributions should by the 1st July, 1834, amount to §50,000. Did the subscriptions and contributions come up to that sum by the time prescribed? The parties to this agreement saw the necessity of providing for some means by which this condition could be determined other than the subscription papers themselves. The real value of any particular subscription might be a matter of dispute, varying according to the opinions of witnesses. They therefore prudently determined that the question of responsibility should not remain with them, but that they would select a third person to determine it. In this choice they both concurred, and must necessarily have mutually agreed that his *426 decision of that question should be, conclusive. If he decided. that certain subscriptions were responsible, that was to be the end:of'the inquiry. I see not how the conclusion can be- avoided'that the certificate of Mr. Hunt, the umpire, was ;final and decisive, upon the question. This, however, must be taken with a qualification that there was no fraud or imposition practised upon Mr. Hunt in respect to the subscriptions. If there was, it should net- be conclusive. But the burden of proving the affirmative of that question-lies upon the defendant. He alleges several grounds of fraud; and' I will, proceed to notice, those which seem to me to require attention.
It-appears that several -ofthe subscribers were married women, others were female benevolent societies, while -some individúala subscribed ’ specific items ofproperty, all of-which-were included in the estimate in making up the necessary amount; and it is alleged that in doing so a fraud -was committed; It does not necessarily follow because a subscriber is. not legally bound to fulfil his or her-.promise, or that a specific piece of. property shall not sell for a given sum:of money, that'there was fraud in including such cases in.the estimate.. It is in proof that a large share of these female subscribers and benevolent societies were within the circle of Mr. .Hunt’s personal acquaintance, and the presumption is that he was able to judge from personal knowledge, of the responsibility of most-of these subscribers. At any rate the province of judging- of this fact was assigned to him by the respective parties-; and as the papers- containing these subscriptions, as well as those of specific property, were all laid before him, and minutely examined by him, and as there is no proof of any concealment- or false representations by the trustees or their agents, I have no hesitation in saying that the subscribers were concluded upon this point by his decision; He might-have very satisfactory reasons for. believing that these subscriptions would be faithfully paid; and the parties referred the subject to him and agreed, that if he was satisfied in. that respect the:subscriptions should be esteemed available to make up the necessary sum. The question submitted to him- was- not whether the subscriptions were legally binding and could be *427 collected in a litigated suit, but whether in his judgment, the subscribers were able- to pay, and would pay the sums subscribed by them; and whether the contributions of specific property were in his judgment of the value at which they were estimated. I can perceive no evidence of - any imposition practiced upon Mr. Hunt, nor of any fraudulent-concealment on the part of the agents of the college.
Again, it is alleged that the guaranty given.to make good any deficiency in the fund of $50,000 was fraudulently used before Mr. Hunt, for the reason that the guarantors were indemnified by a resolution of the trustees; and it is- said that in fact it amounted to nothing more than a subscription by the trustees-themselves.. To put such a construction upon the acts of the trustees is, in my opinion, a perversion of their acts and designs. It will be remembered that'they were limited to one year within which to raise the given stim, to make-the subscriptions binding upon the subscribers; and the proposition of the trustees to these guarantors was this: if you will subscribe the balance to make the fund complete, we-will agree to continue to raise subscriptions after the year shall expire,1 to save you harmless. There was no agreement express or implied, to pay one farthing, from the funds of the institution, directly or indirectly to this fund. Nor could this fund in any way suffer by. that proceeding. The object of the donors would still be effected in good faith, and in all its original spirit and character. The fund would be raised from the liberality of the public- and' added to the institution. The guarantors agreed to make good the deficiency; and took the risk-upon , themselves, whether the continued efforts to raise subscriptions should be successful or not. I see no trace of fraud in this proceeding; but an honest and praise-worthy effort to promote the cause of education and science.
It is further insisted that the act of the trustees in remitting the subscription of Mr. Dwight, the President; brought the sum below $50,000, and therefore the trustees had failed to perform the condition upon which the promise of Stewart became obligatory. The resolution referred to was passed in September; 1835, more than a year after the time when Stewart became *428 bound, if he ever was bound, to pay his subscription. It was not in fact a release of Mr. Dwight from his subscription, but rather a confirmation of, it. They acknowledged themselves indebted to him for services, in a sum equal to his subscription, and instead of paying him the debt from their general fund, they applied the amount to the payment of his subscription. It was in truth paid by him, instead of his being released from it. But if this view should not be satisfactory to every one, there is another which is conclusive. When the year expired which was to determine whether the subscribers were to be holden or not, and it was certified by Mr. Hunt that the requisite sum had been raised, Mr. Dwight was then bound to pay his subscription. So far as this objection is concerned, the defendant and the other subscribers were bound also. If the contract of the parties was then complete, no act of the trustees after that date, in wasting this fund, could invalidate the obligation of the subscribers to pay. If the trustees mismanaged or abused the trust, they might have been summoned to answer for it in chancery, but it could never vitiate the contracts made by the subscribers.
The only other point that appears to me to require notice, is that made in respect to the ruling of the circuit judge, that there was no question of fact to be submitted to the jury. The defendant on the trial claimed a right to submit to the jury two propositions; 1. That the subscription by which'fourteen gentlemen engaged to make good any deficiency in the subscriptions to the sum of $50,000, was got up and used for a fraudulent purpose. The character of that paper, and its effect upon the engagements of the other subscribers, appear to me to raise. questions of a strictly legal nature, and involve no matter of fact whatever. If Mr. Hunt could have been imposed upon by it, it could only be in consequence of its legal effect, which he might not have appreciated. The act itself was no fraud; it could only become so in consequence of its legal effect, of which the court alone could judge. The judge was therefore right in refusing to submit this matter to the jury. 2. It was denied that the plaintiffs had established by evidence the existence of the promises on the part of the plaintiffs which *429 in some of the counts were alleged to form the consideration of the defendant’s promise. If my views as to the true construction of the subscription paper are correct, no evidence was requisite beyond that furnished by the paper itself. As it respects the performance of the condition, I have shown, I think, that the question presented by the proofs was one entirely legal. It follows, therefore, that there was nothing to be left to the jury, more than there would be in an action upon a promissory note where the signature was proved. The defendant below also contended that he had a right to address the jury on the question whether the $50,000 had been subscribed by responsible subscribers. In my opinion this claim was in violation of his agreement to submit that question to the decision of Mr. Hunt. It was no longer an open question, and the circuit judge was correct in refusing him permission to discuss it before the jury.. These are the only points which he claimed to have passed upon by the jury. I can therefore perceive no error in the ruling of the circuit judge. There were some other objections made, but they appear to me to have been of a trifling character, and I think they were not well taken. I can see no legal objection to the judgment of the supreme court, and shall vote for its affirmance.
Senator Sedgwick also delivered a written opinion in favor of affirming the judgment of the supreme court.
On the question being put, “ Shall this judgment be reversed ?” the members of the court voted as follows:
For reversal: The President, The Chancellor, and Senators Barlow, Beers, Bockee, Burnham, Clark, Corning, Deyo, Emmons, Faulkner, Hand, Hard, Johnson, Lester, Lott, Mitchell, Smith, Talcott, Varney and Wright—21.
For affirmance: Senators Backus, Folsom, Jones, Porter and Sedgwick—5.
Judgment reversed.

 And see Barker v. Bucklin, (ante, p. 45.)