THE STATE ex rel. E. A. PATE et al. v. D. N. OLIVER et al.

*Administration — Evidence — Lease — Merger — Counter-claim — Application of Assets — Liability of Administrators and Executors— Conditional Sale.*

1. Where an intestate had made no effort for seventeen months prior to his death to enforce the collection of a docketed judgment, and his administrator did not move in the matter for more than three years, when, upon motion for leave to issue execution, the judgment debtor proved to the satisfaction of the Court that he had paid the judgment: *Held*, that the administrator should not be charged with that amount.

2. That the evidence of the judgment debtor was competent, on the motion to issue execution, to prove that he had paid the judgment to the intestate.

3. Where an intestate at the time of his death was carrying on a large turpentine business, and had leased from various parties for the current year a number of "boxes," at a stipulated price, and his administrator sold the unexpired leases, together with the turpentine in box, at public sale, when the lessors became the purchasers : *Held*, that under the peculiar circumstances of the case, such sale and purchase did not extinguish the rent or merge the contract of lease in that of the purchase, but the liability of the lessee's estate for the rent for the entire term continued in force.

4. Where an estate is insolvent, no counter-claim against an action, by the personal representative, beyond the rateable proportion of him who pleads the counter-claim to the assets, will be allowed.

5. If the personal representative *voluntarily* yields to the entire amount of a counter-claim when the estate is insolvent, he will be liable to the other creditors for the excess of the rateable portion.

6. But if he honestly resists such counter-claim, and it is adjudged against him by the Court having cognizance of the matter, he will be protected, though such judgment be erroneous and he did not appeal from it.

7. Where there is a valid lien upon property sold by a personal representative, he is required by the statute (*The Code*, § 1416) to apply the proceeds of the sale first to the satisfaction of such lien.

PATE *v.* OLIVER.

8. Where the intestate, in furtherance of a purpose to purchase a tract of land, became the assignee of a debt which was a charge upon it, and by an arrangement with the other parties in interest, assumed to pay a balance which was necessary to complete his purchase, which balance he was adjudged to pay into Court: *Held*, that he thereby became the owner of an equity in the land, and his personal estate was primarily chargeable with the amount so adjudged to be paid, and his personal representative was authorized to discharge it from the personal estate, if sufficient.

9. An administrator will not be charged with the rental value of property found at the death of his intestate in the possession of the latter, where he obtained possession of it under a conditional sale, and the vendor resumed possession and sold for balance of purchase money—particularly when it appeared that the arrangement was beneficial to the estate.

This was a CIVIL ACTION, tried before *Philips, J.,* at January Term, 1888, of the Superior Court of ROBESON County, upon exception to a referee's report.

E. H. Paul died on June 2d, 1881, and the defendant D. N. Oliver administered upon his estate a few days thereafter, entering into a bond in the sum of $16,000, with the other defendants as sureties. This action is brought on that bond by several creditors of Paul. Worth & Worth, who had a suit pending against G. W. Williams, trustee, and D. N. Oliver, administrator, for the purpose of having certain lands sold for the payment of debts, are also parties to this action.

There was a consent reference, and the referee having reported, many exceptions were taken to his rulings. These were all passed upon by *Clark, J.,* at a previous term, and, upon the coming in of the reformed report, according to his rulings, it was confirmed by *Philips, J.,* who rendered judgment, from which the defendants appealed.

The other facts relating to the exceptions passed upon are stated in the opinion.

*Mr. T. A. McNeil,* for the plaintiffs.
*Mr. C. W. Tillett (Jones & Tillett,* by brief), for the defendants.

SHEPHERD, J.: In passing upon the numerous exceptions in this case, we deem it unnecessary to reproduce all the facts presented in the elaborate and intelligent report of the referee· Only so much as is necessary to a proper understanding of our rulings will be stated.

*First Exception.*—The plaintiffs insisted upon charging the administrator with $105.54, the amount of a judgment against John McQueen in favor of R. & J. C. McCaskill, which had been assigned to the intestate in February, 1880.

Execution issued on said judgment in October, 1879, and the homestead of the judgment debtor was set apart and a levy made on the excess. The said judgment being dormant, the defendant administrator, on the 18th September, 1884, instituted proceedings to obtain leave to issue execution upon the same. The judgment debtor filed his own affidavit to the effect that he had paid to the intestate the full amount due upon the said judgment. The Court adjudged, "upon the affidavits and proofs," that the judgment was satisfied. The defendant administrator admitted that, up to the time of his motion, he had taken no steps to collect the judgment. Neither had the intestate taken any such steps, although he was the owner of the judgment some sixteen or seventeen months before his death. The "other proofs" recited in the judgment of the Court are not set out, but we must assume that there was other testimony upon which it acted.

The affidavit of the judgment debtor, however, was competent testimony (*Latham* v. *Dixon*, 82 N. C., 55), and, if believed, was sufficient in itself to support the adjudication. There is nothing in the record to show that the administrator had any evidence by which he could have rebutted the proof offered by the defendant. On the contrary, it appears that an account of $75 against the judgment debtor was found upon the books of the intestate, and that, in an action brought by the administrator to recover the same, the said McQueen recovered, upon a counter-claim,

"a larger amount" against him.   We are unable to see how the estate has lost anything by the alleged *laches* of the administrator, for, had he made his motion before the expiration of three years, he would have encountered the same proof, on a motion to enter satisfaction, as he has met in his motion for leave to issue execution.   The exception is overruled.

*The Second Exception* was abandoned in this Court.

*The Third Exception* is based upon the following findings of the referee:

"E. H. Paul bought a steam saw-mill from Talbot & Sons, and signed a contract, a copy of which is hereto annexed.   Said mill was on the grounds when Oliver administered.   Talbot & Sons took charge of the mill soon after, and sold it July 18, 1881.   Talbot & Sons had papers to show how much had been paid on said mill.   The amount due was $1,393.65, with interest at eight per cent.   The last note was due October 1, 1881.   The mill was worth $25 per month.   When sold, it brought $1,600, of which sum $206.35 was paid to the administrator of Paul, and accounted for by him.   That said administrator never attempted to rent, lease or run said mill after he qualified.   Talbot & Sons made no deduction from the amount due for use of said mill.   Oliver, administrator, did not require Talbot & Sons to bring suit against him for said mill.   The referee does not charge the administrator with anything more than the $206.35 above."

It is not insisted that the administrator should have paid the balance due on the mill and thus preserved it as the property of the estate, but the exception is addressed solely to the failure of the referee to charge the administrator with its rental value.   The exception is as follows:

"That (the report) does not charge the administrator with the rental of the steam-mill from the death of E. H. Paul (June 2d, 1881) to October 1st, 1881, or even to July 18th, 1881."

The contention seems to be that Talbot & Sons should not have been allowed to enter until October 1st, 1881, when the last note became due, but that, as they did enter, they should have been charged by the administrator with rent, as in the case of a mortgagee who enters before condition broken.

Granting that they did not have the right to enter, and that the administrator should not have consented to it, we do not see how the estate has suffered by the transaction. The referee finds that, when Talbot & Sons entered, there was due upon the mill $1,393 65, *with interest at eight per cent.* The contract was dated December 2d, 1880, and provided that the notes should bear interest from the date of the delivery of the property. Assuming that it took from the first of January, 1881 (the time mentioned in the contract), to make the delivery, the interest due on the $1,393.65 from that date up to October 1st, 1881, would be more than sufficient to pay the rent, at $25 per month, from the date of the entry up to the maturity of the last note; and the referee finds that the Talbots accepted the principal alone and paid the balance of the purchase money to the administrator.

Apart from this, however, we think that, under the circumstances, the surrender of the property was not unreasonable, and, as it does not appear that the administrator could have profitably rented the mill during the interval of a few days between his administration and the entry of the Talbots, we see no principle upon which he can be charged with the rents from that period.

Moreover, we are of the opinion that the contract was not a mortgage, but a conditional sale, under which the vendors had a right to enter upon the failure to pay the purchase notes as stipulated. The case of *Frick v. Hilliard*, 95 N. C., 117, we think, fully sustains this view. In this contract there are no words of conveyance whatever, nor any retention of a lien, and it is expressly provided that the title shall remain

in the vendors until the whole of the purchase money is paid. The exception is overruled.

*Exceptions* 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26.—These exceptions may be considered together, as they involve, in a great measure, a discussion of the same principles. It appears that, at the time of his death, the intestate was largely engaged in the turpentine business, and had leased from various parties for the year 1881 turpentine "boxes" for certain stipulated sums. These leases were for the entire year, though the rent was payable at different periods. When the administrator qualified in June, 1881, it was not deemed expedient to carry on these extensive operations, involving, as they did, the expenditure of much capital and requiring the exercise of peculiar skill and judgment. "It was," says the referee, "a risky business, and especially so, unless managed by a party experienced in the business." The administrator, therefore, did not attempt "to work the boxes at all, but advertised regularly the turpentine on the trees and in the boxes, and the unexpired leases thereon, and sold them for cash." To this action, on his part, there is no exception, but the plaintiffs object to the disposition made by the administrator of the assets so realized.

In many instances the lessors became the purchasers both of the turpentine and the unexpired leases, the same having been sold separately. In actions brought by the administrator to recover the purchase money, the lessors interposed as a set-off or counter claim the amount agreed to be paid by the intestate as rent for the whole year. After deducting the amount due for the purchase of the turpentine and unexpired terms, judgments were rendered against the administrator for the balance due upon the said leases. In other cases the administrator voluntarily settled with the lessors on the same principle as that upon which the judgments were founded.

There can be no question but that a lessee, under an express contract, cannot discharge himself by his own act. " Hence, as long as the lease continues, and as far as he has assets, an executor is held liable in debt as well as in covenant for accruing rent, and the assignment of the term by himself or his decedent, affords of itself no immunity." Schouler's Ex. & Admrs., 376.

While conceding this to be true, it is contended by the plaintiffs that the purchase of the unexpired terms by the lessors worked a merger of the same and an extinguishment of the rent.

The authorities cited by the plaintiffs (*Krider* v. *Ramsay*, 79 N. C., 354, and others to the same effect) fully sustain the position that where there has been a surrender of the term the rent is extinguished, but we do not think that these familiar principles apply to our case. So far from being a surrender by the administrator, and an acceptance on the part of the lessors, they distinctly dealt with each other upon the basis that the estate was not to be released from its liability for the rent, and that the leases were to continue. If third persons had purchased, it is very clear that the liability would have continued, and it is equally clear that if the lessors had bid a larger amount than the rent, they would have been liable. The doctrine of merger and extinguishment of rent by the purchase of the reversion, or the surrender of the particular estate, is based principally upon the impossibility of a party paying rent to himself for his own property, and can have no application to a case like the present, where, from the very nature of the transaction, the liability of the estate for the rent was recognized. While the purchase and entry have destroyed the term for many purposes, they cannot, we think, under these circumstances, have the effect of extinguishing the express contract of the intestate to pay the rent for the entire year.

Having determined the liability of the estate for the rent, we will now consider whether this liability constituted a set-off or counter-claim to the actions of the administrator for the purchase money of the. turpentine and the unexpired leases. The estate is insolvent, and, in such cases, it is well settled that no counter-claim can be allowed which will give an undue priority to any creditor, and thus defeat the rights of the others to have the assets applied *pro rata* to their claims. *Rountree* v. *Britt*, 94 N. C., 110; *Mauney* v. *Ingram*, 78 N. C., 96.

The application of the proceeds of the sale of the unexpired terms as set-offs, falls within the condemnation of the foregoing principle. They should have been collected and applied, like other assets, to the payment of the debts. Where this has not been done, and the administrator has voluntarily allowed them as set-offs, he should be charged with them less the *pro rata* part to which the debts to which they were applied were entitled. The report will be so reformed.

Where, however, such proceeds have been so improperly applied by virtue of judgments, duly rendered against the administrator, we think he should be exonerated. It is true that Courts may look behind judgments and see whether they were properly rendered, in order to charge an administrator, but this will not be done where the administrator resisted the claim in good faith and acted as a prudent man would have done with his own under the same circumstances. *Patterson* v. *Wadsworth*, 89 N. C., 407: "Certainly (says RUFFIN, C. J.) an administrator, who honestly defended a suit, is to be protected by the judgment obtained against him *per testes* and *in invito*, although the claim on which the judgment was founded may have been unjust." *Smith* v. *Downey*, 3 Ired. Eq., 278.

But it is said that the administrator should have appealed, and, that for his failure to do so, he is chargeable for the

104—30

erroneous judgments of the Justice's Court. Surely this cannot be the test of liability in such cases. If such be the law, administrators would be made *insurers* of the correctness of the judgments of all Courts except this, and they would be justified in appealing in all cases, no matter how trivial, and thus much unnecessary litigation would be encouraged, the settlement of estates delayed, and many of them wasted by costs and counsel fees. " All that a sound public policy requires (of administrators) is that they shall act in good faith and use ordinary care." MANLY, J., in *Nelson* v. *Hall*, 5 Jones Eq., 32. They are "answerable only for that *crassa negligentia* or gross negligence which evidences *mala fides.*" NASH, J., in *Deberry* v. *Ivey*, 2 Jones Eq., 370; *Patterson* v. *Wadsworth*, 89 N. C., 407. In this case the administrator litigated the claims in good faith, and, under the circumstances, we do not think he is chargeable.

The case of *Barnawell* v. *Smith*, 5 Jones Eq., 168, cited by plaintiff's counsel, was where *no resistance* was made to an improper judgment. In *Williams* v. *Maitland*, 1 Ired. Eq., 92, the administrator was charged by reason of his negligence in not advertising for claims, as required by law, and not pleading such advertisement in bar of a "dishonest debt." In *McLean* v. *McLean*, 88 N. C., 395, it was *admitted* that the note, upon which the judgment was rendered, was executed by the administrator, and it was held that his sureties were not liable. None of these cases sustain the proposition that where there has been a *bona fide* resistance, that the administrator is liable if he does not appeal. There may be cases where the apparent resistance is but a cover for collusion and fraud, and where the debt is so manifestly unjust as to raise a presumption of fraud against the administrator upon his failure to appeal. This is not such a case, and, for the reasons given, the exceptions are overruled.

The proceeds of the sale of the turpentine, however, do not stand upon the same principle as the proceeds of the sale of the unexpired terms, as the lessors had a *lien* upon the turpentine for the rent due them. *The Code*, § 1762; *Avera* v. *McNeill*, 77 N. C., 50. It was the duty of the administrator to apply the proceeds to the payment of the same. *The Code*, § 1416.

In reference to voucher No. 40, the facts are as follows:

"R S. French, being indebted to King & Myrover, executed a deed in trust upon certain land to secure the amount, as set out at page __, record. King died in 1869, and Brown, executor, reduced the notes due King to judgment, and sold, under execution, the trust estate of R. S. French, trustor, and took Sheriff's deed to himself in trust for the heirs of King. Brown and King's devisees sold the land to Paul and executed their deeds for the same on 24th March, 1874. Myrover, becoming dissatisfied, instituted action against Brown, Paul and the devisees of King, and such proceedings were thereupon had, as is reported in 73 N. C., 609. This Court declared that the said sale was void, but that Brown and his grantee, Paul (the intestate), acquired an interest in the King debt 'to the extent that the purchase money paid by them for the land went in extinguishment of that debt,' and that, to that extent, they were declared to be, in equity, the purchasers and assignees of said King's debt. Judgment, in accordance with this decision, was rendered in the Superior Court of Robeson County, at Fall Term, 1875. This judgment directed that Frank McNeill, as commissioner, should advertise and sell the land and distribute the proceeds among the parties entitled. The case was not brought forward on the docket until Spring Term, 1881, when, on the motion of Paul, based upon affidavit, the judgment was so modified that the commissioner, instead of selling said land, should execute a deed to Paul upon his paying into Court the sum of $1,486.65. This

amount, it appears, was the balance of the King debt which had not been paid, Paul having satisfied the Court that he had acquired all the interests of the other parties interested in the land and the debts charged upon the same. It was adjudged in said decree that Paul pay the above amount into Court. This judgment 'was duly docketed' on the judgment docket of said county. In May, 1875, Paul executed to Williams & Murchison a mortgage on said land to secure a large debt due them. In May, 1881, another mortgage was executed to said parties by Paul, securing another considerable debt due them by him. Paul died in June, 1881, and after the defendant administered, he paid the amount of said judgment into Court, and the same was drawn out by John G. Smith, the administrator *d. b. n. c. t. a.* of said King. In 1882, Williams & Murchison sold, under their mortgages, a part of said land for enough to discharge the lien, and the balance, some two thousand dollars, was paid into Court. The remainder of this land is still unsold."

In passing upon this voucher, we do not think it necessary to enter into an elaborate examination of the doctrine of exoneration, as applied to the administration of estates of deceased persons. It is sufficient to say that, in the absence of any controlling direction by a decedent to the contrary, the personal estate is, primarily, liable for the debts of the deceased, although, as in the case of a mortgage or docketed judgment, the creditor has a lien upon the real estate. *Murchison* v. *Williams*, 71 N. C., 135. This is the order of liability established by law, and is not to be disturbed unless the testator plainly expresses a contrary intention. "The law fixes the burden on the personalty, and this can be only altered by the testator; and the intention on his part to alter it is not inferred upon slight grounds. Charging the land is not sufficient. However anxiously it is done, that will not of itself have the effect of exempting the personalty." *Robards* v. *Wortham*, 2 Dev. Eq., 178. There is no will in this

case, and there is no question but that the general rule we have mentioned is applicable.

The contention, however, is that the money paid into Court by the administrator was not a debt of the intestate, but was chargeable, primarily, on the land, and "that the nature of the act by which the purchaser of lands, subject to an incumbrance, makes his personal estate liable, must be a direct personal communication and contract with the mortgagee." In support of this position, authorities collected in the notes to the *Duke of Ancaster* v. *Mayor*, White & Tudor's L. C. Eq., are cited to the effect that, where one purchases land encumbered by mortgage, the land alone is liable, unless the purchaser has, in his life-time, done something by which he has made the mortgage debt his own. Without inquiring whether such a doctrine prevails in this State, especially in view of *The Code*, § 1415, we are of the opinion that this case does not fall within the principle contended for. The whole conduct of the intestate shows his intention to complete his title to the property. To this end he purchased all the legal and equitable interests outstanding, and, on his own motion, obtained a decree of the Court which, in effect, made him the equitable owner of the land charged with the amount due the King estate. This amount it was *adjudged* he should pay into Court, and it was this amount which his administrator has paid. By the decree the intestate, as we have stated, became the equitable owner of a large estate, a part of which, being sold under the mortgages of Williams & Murchison, has, it is said, more than discharged their debt, thus relieving the personal estate to that extent and leaving a considerable sum in money and the remaining part of the land for the benefit of the general creditors.

Not only, in our opinion, did the intestate, by his transactions, assume the amount due the King estate, but we think that, if there had been no such assumption on his part,

the administrator would not be liable in paying off the said charge if the result, as is contended, proved beneficial to the estate. In such a case, equity would interpose and protect him. We are further of the opinion that the intestate having acquired the equitable title to the land charged with the said balance, the administrator was authorized by *The Code*, § 1415, to pay off and discharge the said lien. The foregoing are the objections most pressed on the argument before us, but we have considered them all, and our conclusion is, that the exceptions should be overruled.

The exception to the finding of his Honor that the case of H. L. Myrover was not "dropped" from the civil docket, and also the exceptions as to certain notes and accounts having been returned as desperate, involve a consideration of facts, and the findings of his Honor are conclusive.

The remaining exceptions are to the failure of the referee to report the facts as to certain claims filed against the estate. It does not appear that the facts were so reported in the claims of Beard, Robinson & Co., D. Paul, Z. Filmore and J. C. McEachin. The exceptions as to these are sustained. The exception as to the claim of Benedict, Hall & Co. was abandoned in this Court. If there are any other claims in which the facts are not reported, and which have been excepted to on that ground, it will be the duty of the referee to report the same.

Let this opinion be certified to the Superior Court, to the end that further action may be had and the judgment modified in conformity to it—each party to pay his costs in this Court.

Modified and affirmed.