This is a controversy submitted without action under The Code, by the plaintiffs, The Baptist Female University and the Trustees of the Thomasville Baptist Orphanage and the Trustees of Wake Forest College, against E. B. Borden, executor of W. T. Faircloth, deceased, and E. E. Faircloth, widow of said deceased, and other devisees and legatees named in the will of the said testator, for the purpose of obtaining a construction of the will of the testator and direction to the executor in regard to the administration of his trust.
The facts necessary to a decision of the case are:
(1) That W. T. Faircloth died in the county of Wayne on 29 December, 1900, leaving no children or issue of such, leaving him surviving his widow, E. E. Faircloth.
(2) That the defendant Frank W. Faircloth, Douglas B. Faircloth, Samuel L. Faircloth, and Callie Faircloth, Clara A. Lane, Susan E. Woodard, Fannie M. Faircloth, are the nephews and nieces of the said W. T. Faircloth, and are also his heirs at law. *Page 339 
(3) That the said W. T. Faircloth left a will which was duly admitted to probate, and the executor therein named, the defendant E. B. Borden, duly qualified.
(4) That since the death of W. T. Faircloth and the probate of said will his widow, E. E. Faircloth, has duly filed her dissent thereto, and claims such share of the estate of her husband as she would have been entitled to if he had died intestate. Her year's support amounting to $2,000 has been duly allotted to her.
(5) In addition to such claims, the estate of said testator is indebted to her in the sum of $10,342.07, with interest thereon (479) from 12 February, 1900, which has been reduced to judgment.
(6) That on or about 1 December, 1900, said testator made a subscription of $1,000 to the Baptist Female University of North Carolina for the purpose of aiding in the payment of certain indebtedness already created, amounting to more than $40,000, of said University. That said University is a school under the control of the Baptist denomination, of which the said testator was a member. That such subscription was made or given to Dr. R. T. Vann, president of said institution, a part of whose duty it is to solicit subscriptions for the payment of said debt. The said testator verbally authorized the said Dr. R. T. Vann to announce the said subscription in a public convention of the Baptists of North Carolina, at one of its sessions where other amounts were subscribed by various parties, and the same was announced in the presence of said testator. That said subscription was published in the public prints; that most of the said subscriptions are paid. That the said University, being indebted as aforesaid, employed agents to solicit subscriptions for the payment of said indebtedness, and in securing said subscriptions it incurred liability to said agents. That after said subscription was made as aforesaid the said testator executed his will, which is hereto attached, and made the devises to the University set out in the same.
(7) That the estate of the said W. T. Faircloth, at the time of his death, was worth about $70,000, of which about $30,000 consisted of real estate, and about $40,000 of personalty.
(8) That of the personal estate, about $3,000 was money in bank subject to check, and the remainder of said personal estate consisted of notes, stocks, and bonds, his library and household furniture, the said library and household furniture not exceeding in value $1,000, and of said stocks and bonds some have market value and others no market (480) value, and some of which are above and some below par.
(9) That the real estate described in item 7 of said will is worth from $7,000 to $8,000; the real estate described in item 13 of said will is worth *Page 340 
from $13,000 to $17,000, and the real estate described in item 14 of said will is worth from $5,000 to $8,000.
(10) That after the payment of debts, except the debt claimed by Mrs. Faircloth and the expenses of administering the estate, there will be in the hands of the executor for distribution under the said will, or as the law directs, about $34,000 of personal estate.
(11) That there will not be a sufficiency of said personal estate to pay the legacies provided for in item 6 of the will after the payment to Mrs. E. E. Faircloth of her distributive share of the estate and her claim of $10,342.07.
(12) That after the payment of the share of personal estate of which Mrs. Faircloth will be entitled and her claim of $10,342.07, there will not be sufficient to pay the legacies provided for in item 6 of the will if the value of the property in item 7 is added to the remainder of the personal estate.
(13) That after the payment of the share of the personal estate to which Mrs. E. E. Faircloth is entitled and her claim of $10,342.07, there will not be sufficient to pay the legacies given in items 1, 2, 3, 4, 5, 6, 10 and 11 of said will, if the value of the property devised in item 7 is added to the remainder of the personal estate.
(14) That since the death of said W. T. Faircloth, by consent the defendant J. W. Gardner has rented out the real estate and has received rents and profits thereof, and he now has in hand of said rents and profits the sum of $ ______, to be disposed of as the court may direct.
(15) That the dower of Mrs. Faircloth has been duly allotted to her, and covers the following property devised in said will: The house and lot in which the said W. T. Faircloth lived at the time of his (481) death, fronting on George Street, being the lot referred to in item 8, section 5 of the will of said testator, and also the two-story brick store on Walnut Street, mentioned in item 8, section 2 of said will.
(16) That the said testator prior to his death leased a part of the property mentioned in item 7 of said will to the United States Government, by deed registered in the county of Wayne. That since his death, in accordance with said contract, liabilities to the amount of $ ______ have been incurred for equipment for free delivery in Goldsboro, $ ______ for coal, $ ______ for water and repairs upon property embraced in said lease.
The portions of said will necessary to be set out for the purpose of disposing of this cause are as follows: *Page 341 
In item 1, 2, and 3 general legacies are given to persons therein named of $100 each.
In item 4 the testator gives to Frank W. Faircloth his watch and chain and also certain real estate situate in the State of Virginia.
In item 5 he gives to the trustees of Thomasville Baptist Orphanage $1,000 in money.
In item 6, "I give and bequeath absolutely to my nephews and nieces, Douglas B. Faircloth, Samuel L. Faircloth, Clara A. Lane (wife of B. F. Lane), Susan E. Woodard (wife of Calvin Woodard), Fannie M. Faircloth, Frank W. Faircloth, and Callie Faircloth (wife of said Frank W. Faircloth), each $4,000, to be paid by my personal representative to said legatees by turning over any of my bonds, stocks, notes or other evidences of debt, at their market value; and if these are not sufficient, then the balance of said $4,000 each to be paid in money."
In item 7, "I give and devise to my widow, E. E. Faircloth, and her heirs, my three-story brick building in the northeast intersection of John and Walnut streets in said city and the land on which it stands (called the Law Building), also the single-story brick (482) store and lot on the east side of said Law Building, including ten feet right of way on the east of single-story store, all fronting on Walnut Street. This devise is in lieu of all moneys I received from her properties in Onslow County, North Carolina. I also gave her $500 in cash in lieu of her year's allowance."
In item 8, "I loan and give to my wife, E. E. Faircloth, during her life, the rents, use, profits, and incomes of the following real estate in Wayne County, viz.:
"1. Two residence lots fronting on James Street, lying between Walnut and Chestnut streets.
"2. My two-story brick store, fronting on Walnut Street and lying in the northwest intersection of John and Walnut streets.
"3. My two-story brick stores on the south side of and fronting on Walnut street, between L. D. Giddens and John Slaughter's stores.
"4. My Buckhorn plantation and farm on the south side of Neuse River in Wayne County, on which Rigdon Kornegay and Ely Cobb now live as tenants.
"5. My house and lot on which I now reside, fronting on George Street in the city of Goldsboro. These rents, incomes, etc., mentioned in this item, I intend to belong to my said wife absolutely and to be at her disposal absolutely."
In item 9 he disposes of his household and kitchen furniture, which has been allotted to the widow. *Page 342 
In item 10, "I give and bequeath to the trustees of Wake Forest College my entire law library, for the use of the Law Department of said college."
In item 11, "I give and bequeath to `The Trustees of the First Missionary Baptist Church,' at Goldsboro, and their successors, (483) $1,000 for the use and benefit of said church, as said trustees may deem proper."
In item 12, "After the death of my wife, E. E. Faircloth, I give and devise to my niece, Clara A. Lane (wife of B. F. Lane) and her heirs in fee
my house and lot on which I Now reside, fronting on George Street in said city of Goldsboro."
In item 13, "After the death of my said wife, I give and devise in fee
to the `Trustees of the Baptist Female University of North Carolina' and their successors, situated in the city of Raleigh, N.C. the following real estate in the city of Goldsboro, N.C. hereinbefore referred to, viz.: My two residence lots fronting on James Street, between Walnut and Chestnut streets; my two-story brick store in the northwest intersection of John and Walnut streets, and my single-story brick building on the south side of and fronting on Walnut Street, between the stores of L. D. Giddens and John Slaughter, to be used for the benefit of said University in such manner as said board of trustees may think best."
In item 14, "I direct that after the death of my said wife, my Buckhorn plantation on the south side of Neuse River in Wayne County be sold at public auction at the courthouse door in Goldsboro, after due advertisement, to the highest bidder, by my personal representative, and pay the net proceeds equally to the trustees of the Baptist Female University of North Carolina, at Raleigh, N.C. and to the trustees of the Thomasville Baptist Orphanage at Thomasville, N.C. and said moneys in this item to be used as said board of trustees may think best for their respective corporations."
In item 15, "After the above provisions have been served, I devise and bequeath any residue of my estate, real, personal or mixed, to my nephews and nieces hereinbefore named, to be equally divided between them, share and share alike, the children of any one or more of (484) said nephews and nieces who may have died to take the share that their parents would take if alive."
The first question presented upon the appeal for our consideration is raised by the contention of the plaintiffs, the trustees of the Baptist Female University: That the dissent of Mrs. E. E. Faircloth accelerated the devises provided in item 13 of the will, and that they are now entitled to the possession of the property described in said item not included in the dower, and to the rents and profits thereon. Upon this question *Page 343 
his Honor ruled against the contention of the trustees of the Baptist Female University. In this we think there was error. Mrs. Faircloth having dissented from the will and claimed her dower in the realty and her distributive share in the personality, we are of the opinion that there was an acceleration of the devises, the enjoyment of which under the will was postponed to the time of her death. The will, in so far as provision was therein made for her, operates in the same manner, as to the time of enjoyment by those entitled after her death, as if she had died prior to her husband. In Adams v. Gillespie, 55 N.C. 244, the testator gives to his wife the house and lot on which he lived to have during her life and "after her death" to her daughter. The widow dissented. Battle, J., says: "The dissent of the widow has removed her life estate from all of the property given to her by the will and which she does not take independently, and the effect of it is to hasten the enjoyment of the life estate devised to her daughter."
In Holderby v. Walker, 56 N.C. 46, the testator gives his entire estate to his wife for and during her natural life, and provided that "After the death of my beloved wife, I desire all of the estate devised to her" to go to certain persons, naming them. The widow dissented.Battle, J., again speaking for the Court, says: "It is further admitted that as the life estate intended for the widow is removed out of the way as to all of the property which has not been assigned to (485) her, such property is or will by the consent of the executor become vested in possession." See, also, Wilson v. Stafford, 60 N.C. 647.
We find the same principle announced by other courts. In Brown v. Hunt, 59 Tenn. (12 Heisk.), 404, it is held: "That where a particular estate is devised to the widow with limitation over, and the widow dissented to the will, that thereupon the limitation over took effect at once, except so far as affected the widow's right to her dower and distributive share."
The only case to which our attention has been called which would seem to militate against this view is Beddard v. Harrington, 124 N.C. 51. In that case land was given to the wife "for and during her natural life or widowhood," with the following provision: "After the death of my said wife" the land was given to the granddaughter of the testator. In an action by the plaintiff against the granddaughter, the Court held that she could not recover, for that upon her marriage her estate determined. The Court says: "The widow having remarried, cannot maintain the action to recover possession. The devise to the granddaughter, the defendant, `after the death of my said wife,' cannot take effect until that event, but that cannot avail the plaintiff, who must recover upon the strength of her own title, not upon defects in that of *Page 344 
the defendant." The only question before the Court was the right of the plaintiff to recover possession, and, as her title had determined, it was clear that she could not maintain the action. That was the only point decided in this case. It is true that the Court stated that until the death of the wife the devise to the granddaughter could not take effect, and the title to the land until that time vested in the heirs at law. This language, however, was not necessary for the decision of this case, and in so far as it conflicts with the uniform current of (486) authority, as applied to the facts in the case before us, we do not regard it as binding upon the Court in the disposition of this appeal. 20 Am. and Eng. Ency. (1 Ed.), p. 895, sec. 5. This ruling does not affect the right of the remainderman named in item 12, as the dwelling-house is given to Mrs. Faircloth for her life and at her death to Mrs. Clara A. Lane. It having been allotted to her as a portion of her dower, the status is not changed by the dissent. The two-story brick store fronting on Walnut Street, mentioned in item 8 (2), having been allotted to Mrs. Faircloth as a portion of her dower, the enjoyment of it is thereby postponed until her death. The title to the other real estate given to Mrs. Faircloth in item 8 for life and after her death to the trustees of the Baptist Female University, vests in the trustees at once, and they are entitled to the immediate possession thereof. The Buckhorn plantation given to Mrs. Faircloth for life in item 8 (4) and disposed of in item 14 must be sold at once by the executor and the proceeds paid over to the trustees of the Baptist Female University and the Thomasville Baptist Orphanage, as directed therein.
The result of this ruling in respect to the real estate disposes of contention No. 9 in regard to the rents accruing from this property. The rent which has accrued since the death of Judge Faircloth passes with the property and must be paid to those to whom the real estate belongs. This principle applies also to the rents accruing from the Buckhorn plantation directed to be sold.
His Honor's ruling in regard to the rents of the property referred to in items 13 and 14 is reversed. Rogers v. McKenzie, 65 N.C. 218. This disposes of contentions Nos. 1, 2, and 9 (except as to the property described in item 7).
The contentions Nos. 4, 5 and 6 of the legatees named in item 6 of the record may be considered together. They are, first, From an inspection of the whole will, it appears that it was the intention of the (487) testator that they should have the legacies and that other parts of the will must yield, if necessary to give effect to this intention. Second, That if necessary to pay the legacies, it is the duty *Page 345 
of the executor to sell the real estate devised in other parts of the will. Third, That the bonds, stocks, notes, etc., in the hands of the executor must be applied under the will to the payment of their legacies, and that provision must be made for the payment of debts out of other property of the deceased.
The will contains a plan or scheme for the disposition of the testator's property entirely consistent and harmonious in all its parts. There would be no difficulty in executing the provisions of the will but for the derangement of the plan caused by the dissent of the widow. The result of this action on her part, followed by the establishment of an indebtedness in her favor, materially changes in many respects and prevents the execution of the plan of the testator. We fully recognize the well-settled principle adopted by the courts, that the will shall be so construed that the dissent of the widow shall affect the devisees and legatees to as small degree as possible and that the general scope or plan of distribution be carried out and effectuated so far as possible. "The dissent may defeat some of the arrangements made by the will and accelerate the time of enjoyment of some of the legacies and divises, but it does not affect the construction of the will." Pritchard on Wills, sec. 776.
We are unable to see from an inspection of the whole will that it was the intention or within the contemplation of the testator that any part of his will would fail to be executed, or that upon his death there would be any necessity that one part should yield in favor of another. It is a holograph will, bears date 28 December, 1900. The death of the testator occurring the next day, being the 29th of the same month. The will is drawn with care and is free from ambiguity. The condition of the estate, as shown to us by the case agreed, was such that, (488) but for the dissent of the widow, the executor would have found no difficulty in executing every provision thereof. We cannot, therefore, undertake to say what the testator would have done, or desired to be done, in the condition into which his estate has been placed by the unexpected contingency which has arisen. We must, by an adherence to the rules and precedents laid down by the courts, direct the disposition of the estate, as near as may be, in accordance with the directions of the testator as set forth in his will.
The legacies given his nephews and nieces in item 6 fall within the class known as demonstrative. Mr. Jarman in his work on Wills, ch. 523, in speaking of general and specific legacies, says: "But, besides these two classes of legacies already mentioned, there is a third or intermediate class where there is a separate or independent gift to the legatees and then a particular fund or estate is pointed out as that which is to be primarily liable." *Page 346 
"A demonstrative legacy is a bequest of a certain sum of money, stock, or other like, payable out of a particular fund or security. . . . A demonstrative partakes of the nature of a general legacy by bequeathing a specific amount, and also of the nature of a specific legacy by pointing out the fund from which payment is to be made, but differs from a specific legacy in the particular that, if the fund pointed out for the payment of the legacy fails, recourse will be had to the general assets of the estate." Crawford v. McCarthy, 159 N.Y. 515.
"Such a legacy is so far specific that it will not be liable to abate with the general legacies upon a deficiency of assets, except to the extent that it is to be treated as a general legacy after the application of the fund designated for its payment." Gelbach v. Shivley, 67 Md. 498.
Of course, all legacies are subject to the payment of debts and, when the widow dissents, of her distributive share of the personal estate. The general legacies must give way or be postponed in favor of specific (489) and demonstrative legacies.
The contention of the legatees in item 6, that if necessary to pay the legacies it is the duty of the executor to compel the sale of real estate, cannot be sustained. It is well settled that unless it clearly appears from the will that it is the intention of the testator to charge the payment of debts upon his real estate, the law will not do so. The personalty must be applied to the payment of debts and exhausted before the realty can be subjected. Shaw v. McBride, 56 N.C. 173. "The personalty in the hands of the executor or administrator, whether it be specifically bequeathed or otherwise is first liable to the payment of debts unless specifically exempted; and the real estate belonging to the deceased, no matter in what condition it is found, whether descended or devised, is not liable until the former is exhausted." Knight v. Knight, 59 N.C. 134;Graham v. Little, 40 N.C. 407. "It is safe to say that in the absence of any controlling direction of a testator to the contrary, the personal estate is primarily liable for the debts of the deceased." Pate v. Oliver,104 N.C. 458; Mahoney v. Stewart, 123 N.C. 106. We fail to find in the will any indication of a purpose to change the order of liability fixed by the law, and we affirm his Honor's ruling in that respect.
The sixth contention of the legatees was overruled by his Honor, and we concur therein. From the facts stated, we are unable to see to what other property of the deceased the legatees in this contention refer. After the payment of the debts and Mrs. Faircloth's distributive share, which, as we have seen, have priority over the legacies, there will be *Page 347 
no other personal property in the hands of the executor. In any phase of the question, we sustain his Honor's ruling.
The seventh contention of the legatees, that the property (490) devised in item 7, known as the "Law Building," and an adjoining lot fall into the residuum, was sustained by his Honor and no exception made thereto.
The eighth contention of the legatees, that the property described in item 14 has been converted by the testator into personal state, and that they are entitled to the proceeds thereof in order to satisfy their legacies, was overruled by his Honor, and we concur therein. The direction to sell this property and divide the proceeds between the Thomasville Baptist Orphanage and the Baptist Female University does not change its character in respect to its liability for debts or legacies. Its conversion is for the purpose of division only.
The tenth and eleventh contentions may be considered together. His Honor sustains the tenth and overrules the eleventh, and we concur with him in both rulings. As we have seen, the general legacies given in items 1, 2, 3, 5, and 11 must abate or must be postponed until the demonstrative legacies given in item 6 have been paid in full.
The contention No. 11 1/2, that it was the intention of the testator, as expressed in his will, that all legacies and devises should be paid in full, and that it has become impossible to carry out this intention by reason of changed conditions since the making of the will, and that a court of equity will not permit the loss to fall upon any one legatee, but will apportion the loss ratably, and that it was not the intention of the testator to make mock legacies to them, was overruled by his Honor, and we concur therein. As we have seen, it was the intention and expectation of the testator that all of the legacies and devises given and made by him were to be effectuated. What he might have done in anticipation of the changed conditions, we are not at liberty to conjecture. Hill v. Toms,87 N.C. 492.
The twelfth contention made by the legatees named in items 4 and 10 was sustained by his Honor, and no exception made (491) thereto.
The thirteenth contention, that the executor should pay out of the personal estate all liabilities arising out of the contract with the Government of the United States, set out in paragraph 16, was sustained by his Honor, and the executor excepted. We concur with the ruling of his Honor upon this question. As we have seen, rents, follow the reversion and can only be subjected to the payment of debts when there is a failure of personalty and it becomes necessary to subject the land. The *Page 348 
amount paid by the executor for debts accruing under the provisions of said contract are the personal liabilities of the testator, accruing, it is true, since his death, but in consequence of the contract made by him prior thereto.
The third contention by the trustees of the Baptist Female University that the subscription of $1,000 on the indebtedness of said University, set forth in paragraph 6, is a debt against the estate, and the same was not deemed by the devises in the will of the testator to said University, may be considered in connection with the fourteenth contention of the legatees, in item 6, and the executor, that the subscription of $1,000 is without consideration, and does not create a binding obligation. The facts in regard to these contentions are that the testator made a subscription of $1,000 to the Baptist Female University of North Carolina for the purpose of aiding in the payment of certain indebtedness already created, amounting to more than $40,000; that said University is a school in the control of the Baptist denomination, of which the testator was a member; that such subscription was made or given to R. T. Vann, president of said institution, a part of whose duty it is to solicit subscriptions for the payment of said debt; that said testator verbally authorized said Vann to announce the said subscription in a public convention of the Baptists of North Carolina, where other (492) amounts were subscribed by various parties, and the same was announced in the presence of said testator; that said subscription was published in the public prints; that most of the said subscriptions are paid; that said University being indebted as aforesaid, employed agents to solicit subscriptions, for the payment of said indebtedness, and in securing said subscriptions it incurred liability to said agents for their compensation and expended the money in payment of said agents; that after said subscription was made, as aforesaid, the said testator executed his will, which is herewith attached, and made the devises to said University as set out in the same.
The decision of this question is dependent upon the solution of the question whether there be any consideration to support the promise to give $1,000 to the Baptist Female University. It is well settled by a long line of authorities that "a simple contract is incapable of becoming the subject of an action unless supported by a consideration." Smith on Contracts, 106. This is elementary and needs no citation.
We find a very satisfactory definition of a valuable consideration inCurry v. Mislar, 10 Exc., 153: "A valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit accruing to the one party, or some forbearance, detriment, loss or responsibility *Page 349 
given, suffered, or undertaken by the other." See Clark on Contracts, sec. 64.
We find from a careful examination of the numerous cases which have been decided by the courts of the Union a division of opinion. Among the earliest is Stewart v. Trustees, 2 Denio, 403. Chancellor Walworth uses the following language: "As a subscription of a single individual agreeing to make a donation to another individual or a corporation for the benefit of the done merely, I should find great difficulty in finding a valid consideration to sustain a promise to give without any equivalent therefor, and without any binding agreement on the (493) part of the donee to do anything on his part which would be a loss or injury to him. . . . There is no difficulty in my mind in finding a good and sufficient consideration to support a subscription of this kind made by several individuals. Every member of society has an interest in supporting an institution of religion and learning in the community where he resides. And when he consents to become a subscriber with others to raise a fund for that purpose, the real consideration for his promise is the promise which others have already made or which he expects them to make to contribute to the same object. In other words, the mutual promises of the several subscribers to contribute toward the fund to be raised for the specified object in which all feel an interest are the real consideration of the promise of each. For this purpose, also, the various subscriptions to the same paper and for the same object, although in fact made at different times, may in legal contemplation be considered as having been made simultaneously. The consideration of the promise, therefore, is not any consideration of benefit received by each subscriber from the religious or literary corporation to which the amount of his subscription is made payable, nor is his promise founded upon any consideration of injury which the payee has sustained or is to sustain, or be put to for his benefit. But the consideration of the promise of each subscriber is the corresponding promise which is made by other subscribers. Mutual promises have always been held sufficient as between the parties to sustain the promise of each. And it has also been the settled law from the time of the decision in the case of Dutton v. Pool, Freeman Law Report, 471, in 1678, down to the present time, that a party for whose benefit a promise is made may sue in assumpsit upon such promise, although the consideration therefor was a consideration between the promisor and a third person." (494)
In Dartmouth College v. Woodard, 4 Wheat., 518, Chief Justice Marshall, speaking of the contributions to the funds of that institution, says: "These gifts were made, not indeed to make a profit to the donors *Page 350 
or their posterity, but for something in their opinion of inestimable value, for something which they deemed a full equivalent for the money with which it was purchased. The consideration for which they stipulated is the perpetual application of the fund to its object in the mode prescribed by themselves."
In Congregational Society v. Perry, 6 N. H., 164, 25 Am. Dec., 455, it is held: "Where several agree to contribute to a common object, which they wish to accomplish, the promise of each is a good consideration for the promise of the others."
In Norton v. Janvier, 5 Harrington, 346, Booth, C. J., says: "The law will not enforce a mere gratuitous or voluntary promise made without consideration. But the question is, What is a merely gratuitous promise? If a subscription be made to a common object on condition that such object is accomplished, or sufficient money be raised to effect that object, and that condition is performed, an obligation to pay would be perfect and may be enforced by a suit at law."
In Coll. Inst. v. Smith, 36 Barb., 576, the Court uses the following language: "I am by no means satisfied that, in this country, where all our religious, educational, and charitable institutions are founded by voluntary associations and dependent upon private liberality, the personal benefit to be derived from the erection of a church edifice for worship by himself and family, or the erection of an academy or other institution of learning in his immediate neighborhood for the education of his children, are not works involving a sufficiency of private interest to every citizen and of pecuniary benefit to maintain a promise expressly and distinctly made, received and acted upon in the erection of (495) buildings for such purposes." It is conceded by the Court in this case that this view has not been adopted in most of the cases, and we quote it for the purpose of showing the line of thought passing through the judicial mind upon this question many years ago.
In Williams College v. Danforth, 12 Pick., 541, Chief Justice Shaw, in speaking of a subscription made by several to a common object, says: "In this case there is an express contract between parties capable of contracting upon mutual stipulations, each having an interest in the stipulations of the others, and these stipulations being such as might be enforced by judicial process. The subscription in the first instance was in the nature of a proposal to the college, by its terms not binding till accepted, and before acceptance revocable. But when the college accepted it they bound themselves to the performance of the conditions. The conditions were that they should apply the money, principal and interest, to the general literary, scientific, and religious purposes of the *Page 351 
institution, at Williamston, in which the defendant, with the other subscribers, declared that they had an interest. . . . These were then mutual and independent promises, and according to a well-known rule of law, such promises are mutual considerations for each other." This action was brought upon subscription paper signed by the defendant with others. There were certain conditions upon which the money was to be paid.
In Doyle v. Glasscock, 24 Tex. 200, the Court says: "The case thus disclosed, we understand to be this: "The plaintiff was one of a committee to raise money for the purchase of a site for the lunatic asylum: he applied to the defendant and received his subscription, and on the faith of it (or the committee of which he was one) made the purchase, and the advanced the money, and now calls on the defendant in consideration of the premises to pay his subscription." The Court held that the (496) plaintiff could recover.
In Maine Cent. Inst. v. Haskell, 73 Me. 140, Danforth, J., says: "But we are not prepared to admit that the subscription paper in this case `is a bare naked promise' without any consideration whatever. It is true, no consideration was actually received at the time of signing, but one is plainly implied, if not expressed, from the language used. The promise was of money for a specified purpose, `to make up the building fund for said institution.' The promise was made to a different payee by name, one legally competent to take, incorporated for the express purpose of carrying out the object contemplated in the promise, and therefore amenable to law for negligence or abuse of the trust. It is not of course binding upon the promisor until accepted by the promisee, and may up to that time be considered as a revocable promise. But when accepted, and much more when the execution of the trust has been entered upon, where money has been expended in carrying out the object contemplated, it becomes a complete contract binding upon both parties, the promise to pay or at least an implied promise to execute, each being a consideration for the other."
In Amherst Academy v. Cowles, 6 Pick., 427, 17 Am. Dec., 387, the Court, after reviewing the cases, says: "On this view of the cases which have occurred within this Commonwealth analogous in any degree to the case before us, we do not find that it has ever been decided that when there are proper parties to the contract and the promise is capable of carrying into effect the purpose for which the promise is made, and in fact amenable to law for negligence or abuse of his trust, such a contract is void for want of consideration."
In Collegiate Inst. v. French, 16 Gray, 196, Chapman, J., says: "It is held that by accepting such a subscription, the promisee on his part *Page 352 
(497) agrees with the subscribers that he will hold and appropriate the funds subscribed in conformity with the terms and objects of the subscribers, and these mutual and independent promises are made and constitute a legal and sufficient consideration for each other. They are held to rest upon a well-settled principle in respect to concurrent promises."
In Johnson v. Wabash College, 2 Ind. 555, on a promise to pay a subscription of $50, the Court says: "The only objection made to the recovery of the note is that said note was given without consideration. The accomplishment of the object, in aid of which the money was promised, forms a good and valid consideration for the promise to pay it."
In Petty v. Trustees, 95 Ind. 278, the Court says: "The contract in a case such as this is a peculiar one. The consideration in the contract is not a promise on the part of the religious corporation to build a place of worship, for no such promise is averred; but the consideration is the mutual promises of the respective subscribers each with the other."
In Pierce v. Ruly, 5 Ind. 69, it is said: "The consideration for his promise is the promise which others have already made or which he expects them to make to contribute to the same object."
In Irwin v. Webster, 56 Ohio St. 9, 36 L.R.A., 239, 60 Am. St., 727, the Court said: "That a promise which does not secure a benefit to him who makes it, or loss or detriment to him to whom it is made, or in any manner influence the conduct of others, is not enforcible, is a recognized general rule of law. . . . By the desire of Gilpin, many other persons made donations in money and executed obligations to the University of like character to his, and his promise was an inducement to their donations and promises . . . . Whether the object of (498) the promisors was to secure the opportunity of educating their own children under such influences as they desired, or more generally to contribute to the general welfare by increasing the facilities for higher education, it has been accomplished by the expenditure of money and the incurring of obligations in reliance upon their promises and similar promises from others. Institutions of this character are incorporated by public authority for defined purposes. Money recovered by them on promises of this character cannot be used for the personal and private ends of an individual, but must be used for the purposes defined. To this use the University is restricted not only by the law of its being, but as well by the obligation arising from its acceptance of the promise. A promise to give money to one to be used by him according to his inclination and for his personal ends, is prompted only by motive. But a promise to pay money to such an institution to be used for such designed and public purposes, rests upon consideration. The *Page 353 
general course of decisions is favorable to the binding obligation of such promises. . . . It is not contemplated by the parties, nor is it required by the law, that in cases of this character the institution shall have done a particular thing in reliance upon a particular promise. Not only do the law and the parties contemplate the permanency of the institution, but all promisors understand that the proceeds of their promises will be mingled with prior and subsequent donations, and together constitute the financial support of the enterprise. The cases must be rare indeed in which such contributions or promises would be made if others had not been made before, and rarer still in which they would be made but for the belief that others will be made afterwards. The requirements of the law are satisfied, the objects of the parties secured and the perpetration of frauds prevented by the conclusion that the consideration for the promise in question is the accomplishment, through the University, of the purposes for (499) which it was incorporated, and in whose aid the promise was made." These observations appear to be peculiarly appropriate to the consideration of the question presented in this case.
In Roche v. Roanoke Seminary, 56 Ind. 198, the Supreme Court held "that the subscription required no further consideration to support it than the accomplishment of the object in aid of which the money was promised," which in that case as in this was to go to the endowment fund of an institution of learning.
"A bond payable after the maker's death to a college for its endowment accepted by the college, rests upon a sufficient consideration, and may be enforced after the maker's death." Beach on Modern Law of Contracts, sec. 179. That mutual promises constitute sufficient consideration is well settled by numerous decisions in our reports. In the light of the foregoing authorities and the principles upon which they are based, we are of the opinion that the promise made by Judge Faircloth to pay to the trustees of the Baptist Female University $1,000 is supported by a sufficient consideration and constitutes a legal liability upon his estate. We think that this conclusion may be supported upon several views of the testimony.
The University is duly incorporated, with the power to receive such subscriptions. It is under the control of the Baptist Church, of which the testator was a member. Its trustees had appointed agents to solicit subscriptions. It had incurred liabilities for their expenses and payment for their services. The subscription was made to the president of the University and an announcement thereof made in a Baptist convention. The subscription was thereby accepted, and by its acceptance the University assumed the responsibility, duty, and obligation of applying the money to the purposes for which it was given. Other *Page 354 
person at said time and place made subscription for the same purpose Announcements of each were made in the presence of Judge (500) Faircloth. Most of these subscriptions were paid, and it must be understood, as a reasonable conclusion from the facts stated, that these subscriptions were made at the same time and place, and therefore operated as an inducement for other persons to make subscriptions for the same purpose, which were received by the University, and the duty or trust thereby imposed of expending the money for the purpose for which it was given assumed by the officers of the University.
We think that in either of the several points of view and in accordance with the definition of a valuable consideration hereinbefore given, the promise was supported by such consideration.
We are not inadvertent to the fact that there are a number of authorities holding the contrary. We have carefully examined the cases, and in the absence of any controlling authority in this Court, we have come to the foregoing conclusion.
His Honor overruled the third contention of the trustees, and pursuant thereto sustained the fourteenth contention of the legatees. The trustees excepted to both rulings. We think his Honor was in error.
We do not think that the devises made by the testator to the Baptist Female University operate as an ademption of the debt due the University. While we have not been controlled in the consideration of this question by any supposed intention of the testator, we feel assured that we have effectuated the purpose which he had. It will be observed that he made this subscription about one month prior to his death, and that in his will he gives to the trustees for the Thomasville Baptist Orphanage $1,000 in money. We think that we can see a general purpose running through his mind, after providing for his relatives (501) to divide his estate, after the death of his wife, between the two institutions, one representing the great educational work for girls of his church and the other its fostering care of its orphaned children. We do not think that the devises made to the Baptist Female University are a satisfaction of the debt of $1,000. As no date of payment is fixed, it was due at once; whereas the devise was not to take effect until the death of Mrs. Faircloth. See Iredell on Executors, 222, sec. 7.
The fifteenth contention, that for the purpose of ascertaining the distributive share of Mrs. Faircloth, the expenses of administration and debts shall be deducted from the value of the personal property, and that all stocks, bonds, etc., as are specifically bequeathed to the legatees in item 6, and that for the purpose of providing a fund for the payment of debts the devises of real estate and specific legacies shall contribute pro rata according to their value, is sustained by his Honor, and exception taken thereto by the trustees of the Baptist Female University and *Page 355 
the trustees of the Thomasville Baptist Orphanage and Wake Forest College.
We think that his Honor was in error. As we have been, the realty cannot be subjected or called upon for the payment of debts until the personalty is exhausted. We think that the correct rule for the purpose of ascertaining the distributive share of Mrs. Faircloth is that the debts and expenses of administration shall be deducted from the total value of the personalty, exclusive of the specific legacies, and that after deducting the same one-half of the remainder will be paid to her for her distributive share — the amount paid her for her year's support, of course, first being deducted. Upon the facts stated in the case agreed this would leave an amount smaller than the legacies named in item 6 of the will, and of course these legacies would absorb the balance of the personalty. Arringtonv. Dortch, 77 N.C. 367.
The sixteenth contention, that the property mentioned in item (502) 7 of the will is primarily liable for the debts, was sustained by his Honor. If by this is meant that it is liable to be subjected before the realty specifically devised, we concur with his Honor; and we so construe his ruling upon this contention.
The eighteenth and nineteenth contentions made by Mrs. Faircloth were sustained by his Honor, to which there was no exception.
The twentieth contention made by Mrs. Faircloth, that the investment in North Carolina and Atlantic and North Carolina Railroad bonds and the shares in the Bank of Wayne is a wise and advantageous investment and should not be disturbed, and she contends that she is entitled to one-half thereof in specie, was sustained by his Honor, and the executor excepts.
We are of the opinion that those securities or investments should not be converted into money, unless the exigencies of the estate demand it, and that Mrs. Faircloth is entitled to have her share thereof in specie, provided the executor does not find it necessary to sell them for the purpose of paying debts. It would seem from the condition of the estate set forth in the case agreed that it would not be necessary so to do, and we can see no good reason why Mrs. Faircloth should not have, as near as may be, one-half of these securities in specie. We feel quite sure that the executor will be able and will be inclined to comply with her wish in regard to this property. We would not be understood as saying that a distributee has a right to demand investments of this character in specie, unless it is manifest that no necessity exists for converting the investments into money. We can appreciate the difficulty which will be presented in dividing the other one-half of these securities between the seven legatees named in item 6, and such course will be pursued in respect thereto as will promote the interests of the legatees. We *Page 356 
(503) cannot perceive how the legatees named in item 6 can be injured by this ruling, because if these bonds and stocks were sold Mrs. Faircloth would receive one-half of the proceeds.
His Honor directed that there being a deficiency of the personal estate after the payment of debts to pay the legacies provided for in item 6 which was caused by the operation of law by reason of the dissent of Mrs. Faircloth, the court being of opinion that the entire loss should not fall upon the specific legacies or specific devises, adjudged that the said deficiency be apportioned ratably between the specific legatees, including the legatees named in item 6 and the specific devisees. He appoints a referee to ascertain the value of the entire personal estate, etc. To this portion of the judgment the trustees of the Baptist Female University and the Thomasville Baptist Orphanage excepted.
For the reasons hereinbefore given, we think that the judgment in this respect is erroneous. Applying the principles which we have announced, the executor will first deliver to the legatees of the specific legacies, namely, F. W. Faircloth, and the trustees of Wake Forest College, the property specifically bequeathed to them. He will then deduct from the total value of the personalty the debts and charges of administration; one-half of the remainder he will pay to Mrs. Faircloth for her distributive share; the other half will be paid to the legatees named in item 6. Schouler on Executors, sec. 490; Iredell on Executors, 238. The executor will, if practicable, deliver to Mrs. Faircloth, as a part of her distributive share, one-half of the securities hereinbefore mentioned, and the other half will be delivered to the legatees in item 6 of the will. The rents accruing from the several pieces of realty will be paid to the devisees to whom the realty is given. The rents on that portion allotted to Mrs. Faircloth as her dower will be paid to (504) her. The executor will take from the legatees refunding bonds to indemnify him against any claims which may accrue by reason of the contract made by his testator with the United States Government in regard to the "Law Building."
This case has presented a number of questions of which a court of equity would not take jurisdiction in the exercise of its duty and power of advising executors and trustees. Taylor v. Bond, 45 N.C. 5; Cozart v.Lyon, 91 N.C. 282; Tyson v. Tyson, 100 N.C. 360.
This being a controversy without action under The Code, we have found no difficulty in taking jurisdiction and deciding the questions affecting the rights of devisees in connection with advising the executor in discharge of his trust.
The costs of the appeal will be paid by the executor out of the funds of the estate. The judgment of his Honor is
Modified and affirmed. *Page 357