M. G. TAYLOR v. J. A. EVERETT, W. J. WHITAKER, JAMES H. WYNN, AND GEORGE H. HARRISON.

(Filed 24 September, 1924.)

1. **Banks and Banking—Corporation Commission—Bank Examiner—Conditions Under Which Bank May Continue.**

   Among other powers conferred by statute, the Corporation Commission may, without taking possession of the business and property of a State bank, upon its appearing to the commission to be in imminent danger of insolvency, direct upon what conditions its officers may continue in its management and control, and thus, upon the bank's complying therewith, avoid losses to depositors, creditors, and stockholders, necessarily incident· to the closing of its doors.

2. **Same—Impairment of Capital Stock—Directors—Stockholders—Agreement—Contracts—Actions—Parties.**

   Where, upon the examination of a State bank by the chief examiner of the Corporation Commission, it appears that its continued management by

its officers would result in loss to its creditors, depositors, or stockholders, unless upon compliance with certain conditions, and the directors, also stockholders therein, have passed a resolution and have separately and individually agreed to restore the impairment of its capital stock, as directed by the bank examiner, according to their several holdings of shares of stock therein, the members thus assenting, become liable to the bank under the terms of their agreement, as the beneficiaries of the agreement, jointly and severally, to the extent they have assumed the liability; and where some of them have paid the liability of others under this agreement, each one of them may maintain his action against each of the defaulting members (C. S., 446), and such is not a misjoinder of parties prohibited by statute.

### 3. Same—Stockholder's Liability.

The agreement of the directors to make good the impairment of the capital stock of a State bank as a condition precedent to the management of its business by its own officers, and at the instance of the State Bank Examiner, acting according to the power conferred by the statute upon the Corporation Commission, renders such directors, as stockholders, liable to the extent of the obligations they have thus assumed, this liability is independent of, and not contemplated by, the statute creating an additional liability to the amount of stock held by them in the banking corporation.

### 4. Same—Subrogation.

An agreement of the board of directors of a State bank, both by resolution and individually, to comply with the order of the State Bank Examiner in making good an impairment of the capital stock of the bank and putting the bank in a safe condition for the continuance of its business, may be enforced by the bank, or in subrogation to its rights by those of the directors who have paid the obligations of others who have failed in the performance of their individual agreement, the contract thus made being for the benefit of them all.

APPEAL by defendants from judgment rendered by *Lyon, J.,* at May Special Term, 1924, of MARTIN.

This action was instituted by the plaintiff M. G. Taylor against the defendants J. A. Everett, W. J. Whitaker, and James H. Wynn, to recover the sum of $331.50, with interest thereon from 22 April, 1921. The defendant W. J. Whitaker having died since the institution of the action, by consent, his executors, John D. Biggs and H. H. Cowen, were made parties defendant. Judgment was rendered in favor of the plaintiff and against the defendants.

It is admitted that plaintiff and defendants, citizens and residents of Martin County, were, during the month of April, 1921, and for some time prior and subsequent thereto, stockholders and directors of the People's Bank, a corporation organized under the laws of North Carolina and doing a general banking business in said State, with its place of business at Williamston, in Martin County.

It is further admitted that, on or about 4 April, 1921, the officers and directors of the said bank were notified by the Chief Bank Examiner of North Carolina that it would be necessary that $160,000, in cash and securities, to be approved by the Banking Department of the Corporation Commission of North Carolina, be immediately put up and into said bank to strengthen the credit of said bank and "put it in condition to avoid the closing of its doors and the winding up and settling of its affairs and liquidating its business."

It is alleged in the complaint that said notice was given the said officers and directors, by and with the authority of the Corporation Commission of North Carolina, after previous examination of the said People's Bank, that said bank examiner had full power and authority, under the laws of North Carolina, to close the said People's Bank upon the failure of the directors and stockholders to comply with said notice, and that upon such failure the said bank examiner would have closed said bank, "to the inevitable and great and irreparable loss to plaintiff and defendants, in money, property, credit, and public confidence."

The further allegations in the complaint are as follows:

"3. That immediately upon the receipt of said notice from said Chief Bank Examiner, to wit, on 5 April, 1921, there was held a meeting of the directors of the said People's Bank at its banking house in the town of Williamston, in said county, at which meeting there were present, in person, and participating in the discussion had and action taken, nineteen out of twenty-three directors of, and shareholders in, said bank, including plaintiff and defendants; and then and there it was mutually agreed, not impliedly, but expressly, upon roll-call, that each of said shareholders and directors would pay into said bank his pro rata part of the amount required to keep said bank a going concern and to avoid the closing of its doors, said pro rata part being based upon the number of shares of stock held by each; the amount to be paid by each director present being then and there fixed and stated in figures, and expressly assented to, with the express promise by each to pay in the amount so fixed and stated, upon the terms as to cash and deferred payments prescribed by said bank examiner; and the defendants, and each of them, then and there contracted and agreed with plaintiff, in consideration of plaintiff's agreement to pay in the sum of $1,578.00, representing plaintiff's pro rata part, that they would pay in the amounts of their respective pro rata parts, to wit, $15,780 as to defendant J. A. Everett, $7,890 as to defendant W. J. Whitaker, $2,630 as to defendant James H. Wynn.

"4. That thereafter, in compliance with his agreement with defendants, and in full performance thereof on his part, and relying on the agreement of defendants so to do, plaintiff paid into said bank his agreed pro rata part of said sum of $160,000, in accordance with condi-

tions prescribed by said State Bank Examiner, and, as plaintiff is informed and believes, all others who were present or parties to said agreement have done likewise, with the exception only of these defendants.

"5. That the said defendants J. A. Everett, W. J. Whitaker, and James H. Wynn, and each of them, notwithstanding their express promise and agreement so to do, and in breach and violation thereof, and notwithstanding their knowledge that their codirectors and coshareholders, in reliance upon the agreement of defendants, had paid into said bank the respective amounts for which they had made themselves and become liable, refused and failed to put up or pay in the amounts agreed to be paid in by them, or any part thereof, notwithstanding repeated requests and demand that they do so.

"That the said defendants, as plaintiff is informed and believes, after having contracted with plaintiff, as heretofore alleged, and notwithstanding said contracts, but in disregard and in violation thereof, and without the knowledge of plaintiff at the time plaintiff made payment of his pro rata part of said sum of $160,000, as aforesaid, wrongfully and unlawfully agreed among themselves to violate said agreement with plaintiff and others, and to breach the said contract with plaintiff; and each of the said defendants did wrongfully, unlawfully and maliciously induce his codefendants to violate said original agreement and to breach the contract entered into with plaintiff, as hereinbefore alleged.

"6. That upon and because of such default by said defendants, and because of the imperative necessity of prompt compliance with the condition prescribed by said bank examiner, and to avoid loss to plaintiff and his codirectors, coshareholders, including defendants and others, and as the only alternative, and as a necessary consequence of said defendants' default, plaintiff was obliged to, and did, on 22 April, 1921, pay and put into said bank the additional sum of $331.50, representing plaintiff's pro rata part of the deficiency existing because of the breach of their contract by defendants.

"7. That by reason of the payment into said bank by plaintiff of the aforesaid sum of $331.50, together with the sums paid by others who complied with said agreement, making good the deficiency created by the default of defendants, the said bank was saved from insolvency and a receivership to wind up its affairs, and defendants have received the benefit thereof as fully in all respects as though they had themselves complied with their agreement, and are still such beneficiaries.

"8. That by reason of the default and breach of contract by the defendants in the respects hereinbefore alleged, and as a natural consequence flowing from said breach, plaintiff has been damaged in the

sum of $331.50, with interest thereon from 22 April, 1921, at the rate of 6 per cent per annum."

The complaint, duly verified, was filed on 14 June, 1922.

Thereafter the defendants filed demurrer, upon the following grounds:

"1. For that on the face of the complaint there is an apparent misjoinder of parties and of causes, the plaintiff alleging several promises to the three defendants, alleging both joint and several liabilities. This action, upon the allegations of the complaint, should be brought under the laws of this State against each defendant severally.

"2. For that the complaint alleges a mutual contract and agreement of nineteen parties as a single contract, whereas only four of the parties to the said alleged contract are parties to this action, results in a nonjoinder of parties."

The demurrer was overruled by the clerk, and upon appeal by the defendants, his Honor, John H. Kerr, judge presiding in the courts of the Second Judicial District, heard said appeal, and on 15 February, 1923, "ordered that the demurrers be overruled and that defendants have sixty days within which to file answers."

To the order and judgment overruling the demurrer the defendants and each of them excepted, and this was defendants' first exception.

Thereafter defendants filed answer to the complaint, and the action was tried before his Honor, C. C. Lyon, and a jury, at Special May Term, 1924, upon the issues raised by said answer.

The evidence offered at the trial showed that an audit of the People's Bank, made early in 1921, disclosed that its capital stock had become impaired. Plaintiff and defendants and seventeen others were directors of said bank. A meeting of all the directors was held on 2 April, 1921, at which the report of the auditors was discussed, and at which, as a result of said discussion, the following motion was unanimously adopted, as appears in the minutes of the said board of directors:

"That the directors will, subject to the approval of the State Bank Examiner, provide additional assets to the amount of $150,000 in lieu of similar amount of paper now in the bank, regarded as unsound or doubtful, the said $150,000 to be payable 10 per cent in cash and the balance in deferred payments, to be adequately secured."

On 4 April, 1921, the Chief State Bank Examiner of North Carolina dispatched a letter to the president of the said bank, advising him that "Your bank has sustained a heavy loss on account of the manipulations of your former cashier, and also on account of several bad loans." The loans upon which losses had been sustained were specifically referred to in said letter, the aggregate amount being in excess of $160,000. The said president is further advised that, "For the purpose of strengthening your credit, which is absolutely necessary, if you expect to continue

business, your Liberty Bonds will have to be sold and provision made to absorb this loss. In order that the solvency of your bank may not be questioned, it is necessary that $160,000 be put up to take care of the loss that may accrue from the above, and any other loss that may develop on account of the condition that your bank is now in. Ten per cent of this amount will have to be paid in cash within the next fifteen days, and the balance properly secured with collateral, the security to be passed upon by this department."

Clarence Latham, Chief State Bank Examiner, testified that an audit of the said bank had been made, under his supervision, prior to the date of the said letter.

Immediately upon receipt of this letter, the president of the bank called the board of directors to meet on 5 April, and at said meeting the said letter was read and discussed. Plaintiff and defendants were present at said meeting, heard the discussion, and participated in the business transacted.

As a result of said discussion it was agreed among the directors present—nineteen out of twenty-three—that they would put up the sum required, in order that the bank might continue business, to wit, $160,000, the motion recorded in the minutes of the said meeting being as follows:

"That the board of directors assume the obligation as outlined in the letter of the State Bank Examiner of 4 April, 1921, assuming $160,000 upon the basis of stock as held by the directors, totaling 304½ shares, $526 per share, and that members not present be required to comply on the same basis as the directors present."

This motion was carried unanimously.

Thereupon the pro rata amount to be paid by each director, of the sum required, to wit, $160,000, was ascertained and the apportionment was made, the amount to be paid by each director being announced and recorded in the minutes. This apportionment was unanimously approved, and the following record was made in the minutes of the said meeting:

"After each director was polled, then the following motion was made and unanimously carried: That the directors assume the above-mentioned $160,000, and assume and agree to pay the amount set opposite their names, the said amount having been stated to each director, and his apportionment being duly understood by him."

The amounts thus apportioned to the plaintiff and the defendants were as follows: M. G. Taylor, three shares, $1,578.00; J. A. Everett, thirty shares, $15,780.00; James H. Wynn, five shares, $2,630.00; W. J. Whitaker, fifteen shares, $7,890.00.

Thereafter, and before 21 April, 1921, all of the said sum of $160,000 was paid or secured with collateral satisfactory to the State Bank Examiner, except the amounts apportioned to the defendants and assumed by them at the meeting of 5 April.

A meeting of the directors was held on 21 April, 1921, at night. The State Bank Examiner was present, and upon learning that the full amount of $160,000 had not been paid in, as required, as a condition of the bank's continuing business, he notified the directors present that unless the amount was made up they would not be allowed to open the doors the following morning.

The State Bank Examiner testified that "The capital stock of the bank was impaired at that time. With that impairment existing, the bank was in an unsafe and unsound condition to continue business. I did not consider the bank at that time insolvent, but bordering on insolvency. I had full and complete knowledge of its financial status at that time. A bank can have an impairment of capital stock, under the laws of North Carolina, and still not be insolvent. I did not consider that there was enough loss to absorb the capital stock, surplus and profits.

"The meeting of 21 April was for the purpose of making up the shortage caused by the default of these three men who failed to put it up. I know that the collateral was placed in the bank, and that. 10 per cent was paid in cash on the day I was there. I approved the collateral taken as worth $160,000. I had no interest in the bank, except as to the welfare of the depositors and stockholders. I had no concern as to who put up the $160,000. If my requirement had not been complied with, I would have closed the bank.

"Neither of the defendants attended the meeting. held on 21 April, at which the deficiency caused by their failure to pay the amounts apportioned to him was made good by the other directors."

W. S. Ryland testified that during the early part of 1921 he was vice-president of the National State and City Bank, of Richmond, Va.; that this bank was a creditor of the People's Bank at Williamston, N. C.; that, representing his bank, he was on several occasions in Williamston while the audit of the People's Bank was being made, and that he made, more or less, an individual examination to satisfy himself as to the "goodness of our claim against the bank, and was more or less closely in touch with the accountants during their examination, going over the securities of the bank at different times, and was fairly familiar with them."

That on 5 April, 1921, the capital stock of the People's Bank was, in his opinion, impaired. The payment of the $160,000 was sufficient to make sure the solvency of the bank at that time.

That he was present at the meeting held on 2 April. The subject of discussion then was the question of making good the shortage. Everett, Wynn, Whitaker, and Taylor were all there. The question was pretty generally discussed in anticipation of a demand from the bank examiner. The board was canvassed, as a whole and individually, as to whether or not it would be to the interest of the directors to raise enough money to keep the bank going. He heard Mr. Everett's name called, and heard him answer, stating that he would put up his pro rata part. Mr. Whitaker and Mr. Wynn did the same.

A. Anderson testified that he was a director of the People's Bank in 1921; that he was present at the meeting held on 2 April, when the report of the auditors was discussed and the directors agreed to put up $150,000. All the directors were present. Later "we got notice from headquarters that we would have to make it $160,000."

That he was present at the meeting held on 5 April. Mr. Everett, Mr. Whitaker, and Mr. Wynn were there. It was decided to put up the $160,000, as required by the State Bank Examiner. The matter was put to a vote, on roll-call of each man. Wynn, Whitaker, and Everett all agreed to put up their pro rata parts.

At the breaking up of the meeting, Mr. Staton, the president, said: "I want it thoroughly understood, because I have got to make a report. Anybody not willing to what has been done, say so now." Whitaker replied: "I am going to do it, but I can't say I am willing to it."

Whitaker, Wynn, and Everett did not put up their parts. The directors were to have fifteen days to put up collateral and notes. "During the fifteen days I carried mine in, and supposed the rest were carrying theirs in, but just before we had to have a final meeting that Saturday Mr. Everett, Mr. Wynn, and Mr. Whitaker had not put up theirs. They appointed me to go to see Mr. Everett and see if I could get him to live up to his agreement. He would not agree to anything. My best recollection is that Wynn agreed that it was his duty and that he would put up. This was just before we had our final meeting. I had paid mine. Mr. Wynn told us to go back, and that he would be there. We came back, had the meeting, waited a considerable time for Wynn, then went to look for him and found him at Whitaker's. They came to town, but did not come to the meeting."

Henry D. Peele testified that he was a director of the People's Bank and was present at the meeting after the auditor's report was filed. The plaintiff, Mack Taylor, and the defendants Everett, Wynn, and Whitaker were there. The proposition to put up $150,000 was discussed, and all present definitely agreed to put up the said sum, each director agreeing to put up his pro rata share. The bank examiner had not been in Williamston since the audit was completed. Subsequently he came down,

and on 5 April a meeting of the directors was held, at which his letter requiring. the directors to put up $160,000, if they wished to continue business, was read.  The plaintiff and all three defendants were at this meeting.  The letter was discussed and talked about.  The roll was called, and each man agreed to put up his part.  I put up my part. Neither of the defendants paid his part.  Their failure to do so caused a shortage of about $27,000.  The plaintiff had to put up $331.50 more on account of their shortage.  This was done on the night of 21 April. If they had not agreed to put up their pro rata part, witness would not have agreed to put up his part.  At the time witness put up his part, he did not know defendants were not going to put up theirs.

J. J. Manning testified that he was a director of the People's Bank and was present at the meeting held on 2 April, when it was agreed to put up $150,000.  All the directors, except George Harrison, were present.  He claimed to have sold his stock.

Witness was also present at the meeting on 5 April, when the letter of the bank examiner requiring that the directors put up $160,000 was read.  Plaintiff and defendants were at this meeting.  The matter was gone into and talked about, and it was agreed by all that the $160,000 should be paid in, and that the bank should continue business.  Witness paid his share.  Witness thought everything was settled, but was called to another meeting and learned that defendants had not paid their parts.  Everett, Wynn, and Whitaker failed to pay in their shares, and the other directors had to raise the money to make good the deficiency, for "We were already tied.  I had put up mine at that time.  I went to see the defendants, but they failed and refused to do anything."

Mack G. Taylor testified that he was the plaintiff; that he was a stockholder and director of the bank, owning three shares.

Witness was present at the meeting held on 2 April, at which the report of the auditor was read, and the question of putting up $150,000 was discussed.  All three defendants were present.  All agreed to put up the $150,000, each paying his pro rata share, in money and collateral.

On the following Tuesday, 5 April, another meeting was held, at which a letter was read by Mr. Staton, the president, from the bank examiner.  "We were informed that we had to raise $160,000 instead of $150,000.  All agreed to pay that amount.  I paid my part.  If I had not relied upon the promise of Everett, Wynn, and Whitaker to pay their pro rata part, I would not have put up mine."

Witness further testified that he had to put up $110.50 more on each share, on account of the default of the three defendants.  He has paid this and does not now owe the bank a cent.  The extra amount was $331.50.  Something was said about the directors being personally and

individually liable for all damages growing out of the bank's default, but I understood that we were voluntarily putting up the $160,000 to save the bank from breaking.

J. G. Staton, president of the bank, was tendered to the defendants for cross-examination, and testified that a very substantial portion of the $160,000 had been paid in money, probably $25,000 not yet paid in cash. The collateral put up was satisfactory to the committee and to the bank examiner.

Mr. Latham, the bank examiner, was present at the meeting held on 21 April. The three defendants had not paid their shares. "Mr. Latham said, in no uncertain words: 'This money must be arranged tonight and agreed to be paid, and if it is not the bank will not be allowed to open tomorrow.'" After this the deficiency was made good. Taylor, the plaintiff, has paid all his share of the default.

Some days after 5 April, Mr. Everett gave his note for the share apportioned to him of the $160,000. His note was good. Some time before the expiration of the fifteen days Everett came to witness and asked for his note, saying that he wanted to show it to some one, or to see something about it. The witness, having confidence in Everett, gave him the note. It has not been returned. Everett promised to return the note.

At the close of evidence offered by plaintiff, defendants moved for judgment of nonsuit. Motion denied. Defendants excepted. This is defendants' second exception.

The defendants then offered evidence, as follows:

James A. Everett testified that he was one of the defendants; that he did not vote against putting up the $160,000, because he "owned a right smart of the stock in the bank, and the bank owed him money. Mr. Latham and Judge Bragaw recommended it so high, saying that the putting up of $160,000 would make the bank as good as new." He relied on what they said, and next morning gave the president of the bank a note for the full amount of his part, but later learned that the condition of the bank was bad. He then got his note back. The bank "busted in about a year after that."

"I rather think that they read a letter to the effect that every one of the stockholders was liable for all that the bank lost. I had been fooled so bad that I promised myself that they were not going to fool me any more. I did not attend any more meetings of the directors. I found out that the bank was in bad condition. I made a mistake, because I ought to have found out before I gave the note. I left the note at the bank one day and got it back the next day. I did not say a word at the meeting, but, being silent, that gave consent. I let them put up

theirs, relying on my silence, and when the time came to put it up I did not put up my share. I did not tell the others anything about not going to put up my share."

James H. Wynn testified that he was one of the defendants; that he was at the $160,000 meeting, but does not remember whether he was at the $150,000 meeting. "I did not agree to anything. My understanding was that the bank would be closed if something was not done. I carried check for 10 per cent and told Mr. Staton that that was as far as I was going. I think I remember Mr. Staton reading a letter from the bank examiner at a meeting. I remember that each man's name was called, and that it was stated how much his pro rata part would be."

Defendants then offered in evidence the summons, dated 3 June, 1922.

At the conclusion of all the evidence, defendants renewed motion for judgment as of nonsuit. Motion denied, and defendants excepted. This was defendants' third exception.

The defendants tendered issues, which the court declined to submit. No exceptions are noted in the case on appeal to the refusal of the court to submit these issues.

Issues were then submitted by the court, which, with the answers of the jury, were as follows:

1. Did defendant J. A. Everett enter into the agreement to contribute his pro rata part of $160,000 to be put in the bank, as alleged in the complaint? Answer: Yes.

2. Did defendant J. H. Wynn enter into the agreement to contribute his pro rata part of $160,000 to be put into the bank, as alleged in the complaint? Answer: Yes.

3. Did W. J. Whitaker enter into the agreement to contribute his pro rata part of $160,000 to be put in the bank, as alleged in the complaint? Answer: Yes.

4. Did the defendants breach the said agreement, as alleged in the complaint? Answer: Yes.

5. If so, what amount is plaintiff entitled to recover of defendants by reason of such breach? Answer: $331.50.

To the issues submitted, defendants in apt time objected. Objection overruled. Defendants excepted. This was defendants' fourth exception.

Defendants in apt time excepted to the following instruction given in the charge of the court, and assigned same as error:

"If you answer the first, second, third, and fourth issues 'Yes,' then you would answer the fifth issue whatever amount you may find that he paid, and had to pay, in consequence of the default of the three defendants, and on whatever amount you may find that he paid, he is entitled to interest from 21 April, 1921." This was defendants' fifth exception.

17—188

The remaining three exceptions of defendants appearing in the case on appeal, and upon which assignments of error are made, are formal.

*Dunning, Moore & Horlon, and Stephen C. Bragaw for plaintiff.*
*Stubbs & Stubbs, Critcher & Critcher, and Ward & Grimes for defendants.*

CONNOR, J.   Defendants demurred to the complaint, and excepted to judgment of the court overruling their demurrer; thereafter they filed an answer, and, upon the trial of the issues before a jury, at the close of plaintiff's evidence, moved for judgment as of nonsuit.   Upon the overruling of this motion, defendants offered evidence, and at the close of all the evidence again moved for judgment as of nonsuit.   This motion was denied, and defendants again excepted.   C. S., 567.

The first and second assignments of error are based upon these exceptions, and defendants rely upon them chiefly upon their motion for a new trial.

The evidence introduced upon the trial supports the allegations. of the complaint; therefore these assignments of error, and the exceptions upon which they are based, may be considered together, for defendants thus present the question as to whether or not plaintiff can recover of the defendants in this action.

Plaintiff and·defendants were stockholders and directors of the People's Bank, a corporation organized and doing a banking business at Williamston, N. C., under the laws of North Carolina.   The said bank was under the general control and supervision of the Corporation Commission of North Carolina.   C. S., ch. 21, sec. 1035, subsec. 7; Laws 1921, ch. 4, sec. 63.   The Corporation Commission is authorized by chapter 4, section 72, Public Laws 1921 (ratified 18 February, 1921), to appoint a Chief State Bank Examiner, whose duties and powers are prescribed by law.   The commission is expressly authorized by section 16 of said chapter to take possession forthwith of the business and property of any bank under its control and supervision, whenever it shall appear that said bank—

"2. Is conducting its business in an unauthorized or unsafe manner.

"3. Is in an unsafe or unsound condition to transact its business.

"4. Has an impairment of its capital stock.

"Such banks may, with the consent of the Corporation Commission, resume business upon such terms and conditions as may be approved by it."

An audit made of the People's Bank, under the supervision of the State Bank Examiner, completed about 1 April, 1921, disclosed that the capital stock of the bank was impaired and that the bank, while not

insolvent, was bordering on insolvency. At a meeting of the board of directors of the bank, held on 2 April, at which defendants were present, as members of the said board, the report of the auditor was discussed; the directors accepted this report as correct and thereupon, unanimously, agreed, "subject to the approval of the State Bank Examiner, to provide additional assets to the amount of $150,000 in lieu of similar amount of paper regarded as unsound or doubtful."

A condition thus existed, under which the State Bank Examiner, acting under the authority of the Corporation Commission, was empowered by law to take possession of the business and property of the People's Bank, and to determine upon what terms and conditions it might resume business.

By his letter of 4 April, 1921, the State Bank Examiner advised the president and directors of the People's Bank of the terms upon which the bank would be permitted to continue business. The statute expressly authorizes the Corporation Commission to permit a bank, whose business and property it has taken possession of, to resume business, upon compliance with terms and conditions approved by the commission. Where the condition of a bank, under its supervision and control, is such that the Corporation Commission is authorized to take possession of its business and property, and then upon terms and conditions approved by the commission, to permit it to resume business, the commission, or the bank examiner, acting under its authority, instead of first taking possession of the bank, and thus closing it, may impose terms and conditions upon which the bank may continue business, and thus avoid losses to depositors, creditors and stockholders necessarily incident to the closing of the bank.

The condition prescribed by the State Bank Examiner in his letter of 4 April, 1921, upon which the People's Bank would be permitted to remain open and continue its business, was that $160,000 "be put up to take care of the loss that may accrue from the above (the manipulations of the cashier and bad loans specified) and any other loss that may develop on account of the condition of the bank. Ten per cent of this amount will have to be paid in cash, within the next fifteen days and the balance properly secured with collateral, the security to be passed upon by this department.

This condition was imposed solely for the purpose of strengthening the credit of the bank and in order that its solvency might not be questioned. The directors, at a meeting held on 5 April, at which the defendants were present, accepted the condition and so notified the bank examiner. Upon the agreement of the directors to put up the $160,000, as required by the bank examiner, the bank was permitted to continue business for fifteen days.

By accepting the terms and conditions contained in the proposal of the bank examiner, the members of the board of directors agreed to pay into the bank, to strengthen its credit, and in order that it might continue business, the sum of $160,000, the said members thus becoming liable to the bank, as the beneficiary of the agreement, jointly and severally, for said sum. As a result of said agreement, the bank was allowed to remain open and to continue business.

On 21 April, 1921, the fifteen days having expired, it was ascertained by the directors and reported to the bank examiner that the whole amount had not been paid in; the deficit being due to the failure of these three defendants to pay in the sums which they had agreed with the other directors to pay. This deficit amounted to about $27,000. The directors who had complied with their agreement to pay in the sums apportioned to each of them, were called upon by the State Bank Examiner to pay in the amount of this deficit and were notified that unless they did so at once, the bank would not be permitted to open for business the following morning. The deficit was immediately made good by the directors other than defendants and the bank opened for business the next morning, with its capital stock restored and its solvency no longer questioned.

The amount for which the defendants had become liable to their codirectors, by virtue of the agreement entered into on 5 April, was paid by these directors, all of whom had paid in their pro rata shares, in accordance with the agreement. The plaintiff in this action paid $331.50 of the deficit and now sues the defendants to recover the sum.

Defendants' first contention, as stated in their brief, is that upon the facts alleged in the complaint they should have been sued "severally because their liabilities appear on the face of the complaint to have been several instead of joint."

This is not an action to recover of defendants because of their liability, as stockholders, for the contracts, debts and engagement of the bank, under C. S., 237, such liability being limited "to the extent of the par value of the stock owned by them." By their contract, made at the instance of the State Bank Examiner, for the benefit of the bank, all the members of the board of directors became liable, jointly and severally, for the payment into the bank of $160,000. Their liability was fixed by their contract, and is not limited by the statute. The bank examiner had no concern as to who put up the $160,000. His requirement was that as a condition of the bank remaining open and continuing business this sum should be put up to take care of losses already sustained and that might develop by reason of the then condition of the bank. This requirement was met by the directors, who assumed the obligation as outlined

in the letter of the bank examiner, not as a board, but as individuals. They became and were jointly and severally liable for the whole amount which they assumed.

The liability of defendants, by virtue of their contract, being joint and several may be enforced either by a joint action against them all, or by separate action against any one or more of them at the election of the creditor. Black's Law Dictionary (2 ed.), p. 662; 33 C. J., 868; *Hanstein v. Johnson,* 112 N. C., 254.

Defendants' second contention is that the liability of defendants upon the facts alleged in the complaint is "to the other directors, including plaintiff, as a unit, and therefore the directors should sue jointly, or one for all."

The beneficiary of the contract made by the directors, including the defendants, is the bank. The contract, however, has been fully performed, the $160,000 has been paid into the bank, and the bank now has no cause of action on the contract against these defendants or any of their codirectors. These defendants not only agreed with the bank examiner, acting for the benefit of the bank, to put up the $160,000, but they also agreed with their codirectors and each of them that they would, each, pay into the common fund, to be raised by all, a sum in proportion to the number of shares owned by each. This they failed to do, and by reason of such failure the plaintiff, acknowledging his liability upon his contract, together with the other directors, except the defendants, have paid in the amount of such default. The plaintiff's share of this amount has been ascertained and fixed definitely. No accounting is necessary to determine it. He alone is interested in the recovery of this amount, to wit, $331.50, from the defendants, under their contract, made with the bank examiner for the benefit of the bank. Plaintiff and defendants, together with their codirectors, were liable for the deficit, due to the default of defendants. The plaintiff having already paid his pro rata share of the $160,000 as fixed by agreement of all the directors, assumed and paid his proportionate part of the deficit, such part being ascertained and fixed in accordance with the agreement entered into by the members of the board of directors. The other directors, although they may have claims against the defendants because of amounts which they have paid in because of default of defendants, have no interest in or liability for the amount which plaintiff paid in as his pro rata part of the deficit.

This action may therefore be maintained by plaintiff against the defendants, without joining his codirectors, for the plaintiff is the only person who has an interest in this cause of action. C. S., 446.

The order and judgment of Kerr, J., overruling the demurrer, is affirmed.

Defendants except to the overruling by Lyon, J., of their motions to nonsuit, and assign same as error.

Defendants contend that the payment by "plaintiff and his associate directors of the amount which defendants had agreed to put up, on 21 April, 1921, was voluntary, without authorization and without necessity because the original agreement at the directors' table was several and not joint."

It is true that the original agreement, entered into on 5 April, 1921, was voluntary. The members of the board of directors were under no obligation, as directors or as stockholders, to put up $160,000 to strengthen the credit of the bank and to remove any question as to its solvency. If the bank was at the time, or should thereafter become, insolvent, the liability of the members of the board, as stockholders, was fixed and limited by statute; C. S., 237. However, the condition of the bank was admittedly such that the bank examiner, acting under authority of the Corporation Commission, had full authority to take possession of its business and property, and if an investigation showed that it would be to the interest of creditors, depositors and stockholders that a receiver be appointed, to apply to the court for appointment of a receiver for the People's Bank. Public Laws 1921, sec. 17.

The members of the board of directors, however, having voluntarily agreed to put up the $160,000, and thus complied with the condition prescribed by the bank examiner for the continuance in business of the bank, they became, jointly and severally, liable for the sum which they had agreed to put up. Having thus induced the bank examiner to allow the bank to continue in business, and the bank having continued its business because of the agreement, they were each and all liable for the payment into the bank of the sum required by him.

The right of the bank to enforce in the courts liability of all the directors for the sum which they had agreed to pay is admitted, but, in view of the situation brought about on 21 April, 1921, by default of defendants, it cannot be said that there was no necessity for action by the other directors, including the plaintiff. There was an admitted default on the part of the directors. They had not put up $160,000, in cash and securities, within fifteen days, and the bank examiner was not only well within his rights, but was performing his duty when he notified these directors that unless the deficit was paid that night the bank would not be permitted to open the next morning. The directors had not paid in all the sum required, $160,000, although each, except the three defendants, had paid in his pro rata part; they were not only liable for the deficit of about $27,000, but were about to lose the benefit which induced them to enter into the agreement, and to pay in their respective shares; for if the bank should be closed, as stockholders they would assuredly

have suffered "inevitable, great and irreparable loss, in money, property, credit, and public confidence." The plaintiff, although the number of shares of stock owned by him was not large, would have shared in this loss, and his share of the loss would not have been necessarily in proportion to the number of his shares. Men often pay their own debts *without necessity,* but they do not often pay the debts of others voluntarily.

The transaction out of which this action arose is not an ordinary subscription contract, which is defined in 25 R. C. L., p. 1407, as "where the undertaking is to pay the amount set opposite the respective signatures of the parties, the contract of each subscriber being generally regarded as separate from that of others, so as to sustain an action against each subscriber individually." Here the Chief State Bank Examiner advises the "president and chairman of the board of directors of the People's Bank" that "in order that the solvency of your bank may not be questioned, it is necessary that $160,000 be put up to take care of the loss that may accrue from the above and any other loss that may develop on account of the condition that your bank is now in. Ten per cent of this amount will have to be paid in cash within the next fifteen days, and the balance properly secured with collateral, the security to be passed upon by this department.

"You are directed to call your board together at once and take the matter up with them, advising me of their action, in order that I may be guided in my decision with reference to allowing this bank to remain open."

This was the proposal. The acceptance was embodied in a motion passed by the board and recorded in their minutes, as follows:

"That the board of directors assume the obligation as outlined in the letter of the State Bank Examiner of 4 April, 1921, assuming $160,000 upon the basis of stock held by the directors, totaling 304½ shares, $526 per share."

The apportionment of the said sum to the several directors was thereupon made and recorded in the minutes. The State Bank Examiner was informed of the action of the directors. He was not concerned with the apportionment of the sum among the individuals who jointly and severally undertook to pay in the whole amount required.

The plaintiff, having paid $331.50, for which, as between himself and the defendants, the defendants are liable, seeks in this action to recover the same from the defendants.

The People's Bank, for whose benefit plaintiff and defendants, with their codirectors, agreed to raise and put up the $160,000, could have maintained an action against the said directors to recover the full

amount which they agreed to pay. *University v. Borden,* 132 N. C., 476; *Rousseau v. Call,* 169 N. C., 173; *Boushall v. Stronach,* 172 N. C., 273.

The defendants were in default upon their agreement. The plaintiff, although he had paid his pro rata share of the common fund, was liable to the bank for the deficit. He and others, under like liability, paid the sum for which, as between defendants and their codirectors, defendants were primarily liable. Plaintiff and his codirectors, who paid the sum for which defendants were liable, are subrogated to the rights of the bank.

"Subrogation is the substitution of one who, under the compulsion of necessity for the protection of his own interest, has discharged a debt for which another is primarily liable, in the place of the creditor, with all the security, benefits and advantages held by the latter with respect to the debt." *Fidelity Co. v. Jordan,* 134 N. C., 236.

There being no necessity for an accounting in this case to determine the amount which plaintiff paid for defendants, the said amount having been ascertained by the method adopted by all the parties to the agreement for determining the amounts for which each was to be liable, the plaintiff may maintain this action without joining his codirectors.

"Where several sureties pay the debt, and there is no evidence of a partnership, or joint interest, or of payment from a joint fund, the presumption of law is that each paid his proportion, and a joint action cannot be maintained." 6 R. C. L., p. 1061.

"At common law, the several persons who have discharged the common obligation cannot sue jointly one who has not paid his share. Each must sue separately for his portion." 13 C. J., 834.

"In a suit for contribution in equity, or under The Code practice, brought by the obligor who has discharged the debt, all the other obligors should be made defendants." 13 C. J., 834.

The evidence in this case fully sustains the allegation of the complaint. The demurrer was properly overruled. The exceptions to the refusal of the motion for judgment as of nonsuit are not sustained.

The exception to the issues submitted by the court is not sustained. There was no error in refusing to submit the issues tendered by defendants. All matters of defense set up in the answer and supported by evidence were submitted by the court to the jury upon the trial of the issues set out in the record. Nor was there error in the portion of the charge excepted to by defendants.

We have carefully considered all the grounds urged in defendants' brief in support of their motion for a new trial, but are of the opinion that no error has been committed in the trial of this action, and that the judgment should not be disturbed.

No error.